**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 06a0763n.06
Filed: October 12, 2006

**No. 05-6526**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| LARRY LIST, | ) | EASTERN DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

Before: NORRIS, COLE, and COOK, Circuit Judges.

COOK, Circuit Judge. A jury convicted Larry List of (1) conspiring to distribute and possess with intent to distribute marijuana and cocaine (Count One), (2) attempting to possess with intent to distribute cocaine (Count Six), and (3) using or carrying a firearm during and in relation to the attempted possession of cocaine or possessing a firearm in furtherance of the attempted possession of cocaine (Count Seven). List raises numerous challenges to his conviction. For the reasons that follow, we reverse the firearm conviction and affirm in all other respects.

I

This case arises from a years-long Drug Enforcement Agency investigation overseen by DEA Agent David Lewis that resulted in the arrests of List and his drug trafficking co-conspirators—John "Red" Pennington, Roy Gibson, and Danny Gibson (no relation).

In September 1999, List approached Lewis to cooperate in the investigation of the drug-trafficking activities of Roy Gibson (List's employer) and Pennington (Roy's partner). List explained that during his employment with Roy building race car engines, he overheard conversations about Roy selling marijuana and cocaine and, at various times, he observed "Mexicans" delivering large barrels to Roy's farm for unloading. As List told it, Roy grew more open about his drug-trafficking activity: List saw a "Mexican" he had seen previously at Roy's farm pay Roy a large sum of money, and Roy showed List cocaine he claimed was worth $250,000. List also met one of Roy's major drug purchasers, Danny Gibson, who bought 100 pounds of marijuana weekly.

Danny became suspicious of List because List had entered the drug-trafficking business rapidly and had quickly gotten to know the people involved. Upon learning of Danny's suspicion, Roy reassured him that List was "all right" and explained that Roy and List had "messed with the white stuff [cocaine]."

Despite his detailed knowledge about Roy's drug trafficking operation, List denied any serious involvement in the operation and claimed he personally had only one customer—Patrick McAbee. Although testimony showed that McAbee sold List personal-use quantities of cocaine in

1997 or 1998, it also showed List to be a supplier; McAbee purchased cocaine and distribution quantities of marijuana from List. At the end of 1998, List quit working for Roy, and their relationship deteriorated after Roy heard that List was renting garage space from Pete McAbee (Patrick McAbee's father). Pete allegedly owed Roy for at least 100 pounds of marijuana he bought. Because List rented Pete's garage space, Roy believed List was part of the "rip off" and held List responsible for the money Pete owed. Frustrated by the payments Roy had demanded, List approached Agent Lewis. Thereafter, DEA agents asked List to arrange a meeting with Roy and to wear a wire to record statements that would corroborate List's story. Though List agreed to set up a meeting, he refused to wear the recorder. That refusal ended the cooperation arrangement.

In the meantime, DEA agents arrested Danny Gibson and, as part of a plea deal, Danny agreed to wear a wire to a meeting with List and to record incriminating phone calls with him. On these calls, List talked about his own and his co-conspirators' drug-trafficking activities, his dispute with Roy over the alleged marijuana theft, and his threat to shoot Pennington over drugs. Shortly after Danny agreed to cooperate, List asked if Danny was interested in selling a kilogram of cocaine to him. At the same time, List was maintaining contact with Roy; telephone records showed numerous calls between telephone numbers associated with List and Roy. Ultimately, the agents set up a drug deal between Danny and List.

This drug deal occurred in November 2001 when Danny—under DEA surveillance— picked List up at his house, drove a short distance with List, handed him a kilogram of cocaine, and dropped

him off at List's driveway. After exiting the car, List was immediately arrested by DEA agents who recovered the cocaine and a loaded .25 caliber Browning semi-automatic pistol in his coat pocket. In the end, a jury found List guilty of the drug and weapons charges, and he appeals.

II

1. Speedy Trial Act

List asserts that the district court erred in denying his motion to dismiss two counts because the delay in going to trial violated his rights under the Speedy Trial Act ("STA"). We review de novo the district court's legal interpretation of the STA and the factual underpinnings of that ruling for clear error. *United States v. DeJohn*, 368 F.3d 533, 538 (6th Cir. 2004). Under the STA, a defendant must be tried "within 70 days of the latest of the filing of an indictment or information, or the first appearance before a judge or magistrate." *See* 18 U.S.C. § 3161(c)(1). This requirement, however, is subject to multiple exceptions. Relevant here, a court excludes from the STA computation "delay resulting from any pretrial motion." 18 U.S.C. § 3161(h)(1)(F).

List's argument focuses on the filing of two pretrial motions. First, List filed an agreed order to reset the motions deadline (essentially a pretrial motion), which he claims should have tolled the STA clock for at most 4 days[1] because the district court had all the information to rule on the

---

[1]Four days passed from the date the parties submitted the agreed order (June 13) to the original motions deadline date (June 16).

proposed order when List filed it. Instead, the district court tolled 12 days, the number of days between the date the agreed order was filed and the date the court entered the order. To accept List's interpretation would yield 49 days of untolled time (53 actual days of delay minus 4 days for tolling). Second, List maintains that the filing of an ex parte government motion for an order under seal should not have tolled the STA clock. Without this erroneous tolling, he asserts, an additional 26 days expired, which, when added to the previous 49 days, yielded an impermissible 75 nonexcludable days of delay.

List must succeed on both parts of his argument to demonstrate a STA violation, but he fails on both. He concedes that it is "well settled that the filing of any pretrial motion including a motion for additional time, tolls the [STA] clock," but he complains that the district court's delay in entering the order on the first motion was unreasonable. He relies on Supreme Court dicta that "if motions are so simple or routine that they do not require a hearing, necessary advisement time should be considerably less than 30 days." *Henderson v. United States*, 476 U.S. 321, 329 (1986). But "both the Supreme Court and this circuit [have held] that there is no requirement that delays due to motions be reasonable." *United States v. Bass*, 460 F.3d 830, 835 (6th Cir. 2006). And even if we agreed with List that a reasonableness requirement exists, he fails to persuade us that 12 days of delay was unreasonable. *See United States v. Jenkins*, 92 F.3d 430, 440 (6th Cir. 1996) (tolling 30 days from the STA clock despite the defendant's argument that the motion did not need much consideration). Because the tolling of these 12 days was proper, List falls short of the requisite 70 days.

Moreover, even if List were correct on the first part of his STA argument, he still falls short of the requisite 70 days because the government's ex parte motion to file under seal properly tolled the STA clock. List argues, citing no authority for the proposition, that filing an ex parte motion does not toll the STA clock and that ex parte motions should be treated differently from other pretrial motions. But the plain language of 18 U.S.C. § 3161(h)(1)(F) states that "delay resulting from *any* pretrial motion" should be excluded from the STA computation, and we have endorsed this reading. *United States v. Mentz*, 840 F.2d 315, 327 n.25 (6th Cir. 1988) ("*any* pretrial motion . . . admits of no exclusion").

List claims that even if an ex parte motion is "any pretrial motion" that tolls the STA clock, the government's ex parte motion here was different because it was an "investigatory" application for an order to direct the Internal Revenue Service to disclose List's tax returns from 2001. But he does not explain persuasively why an "investigatory motion" varies from other motions drafted in preparation for trial. Simply, List demonstrates no STA violation "because fewer than [seventy] nonexcludable days elapsed" due to the filing of two pretrial motions. *Bass*, 460 F.3d at 834. The district court correctly denied List's motion to dismiss the drug counts because of a STA violation.

## 2. Duplicity

Count Seven of the Third Superseding Indictment reads in relevant part: "Larry List, did use and carry a firearm . . . during and in relation to a drug trafficking crime . . . and did possess a firearm . . . in furtherance of the same drug trafficking crime." List claims this count was duplicitous

because it charges two separate crimes in a single count: (1) using or carrying a firearm during and in relation to a drug trafficking crime and (2) possessing a firearm in furtherance of a drug trafficking crime. Because List did not seek to dismiss this count of the indictment due to duplicity or object to the jury instruction at trial, this court reviews for plain error. *United States v. Newsom*, 452 F.3d 593, 605 (6th Cir. 2006).

"An indictment is duplicitous if it sets forth separate and distinct crimes in one count." *United States v. Davis*, 306 F.3d 398, 415 (6th Cir. 2002). The danger of a duplicitous charge is that it "calls into question the unanimity of a verdict of guilty." *United States v. Savoires,* 430 F.3d 376, 380 (6th Cir. 2005) (citing *Davis*, 306 F.3d at 415-16). "The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or both. . . . A general verdict of guilty will not reveal whether the jury found the defendant guilty of one crime and not guilty of the others, or guilty at all." *Davis*, 306 F.3d at 415 (quotation omitted).

The government concedes that 18 U.S.C. § 924(c)(1)(A) charges two separate and distinct crimes and, therefore, Count Seven—which tracks the statutory language—was duplicitous. *See Savoires*, 430 F.3d at 379-80; *United States v. Combs*, 369 F.3d 925, 933 (6th Cir. 2004). Nevertheless, the government argues that the district court accurately instructed the jury on each separate offense, and that such "proper jury instructions can mitigate the risk of jury confusion and alleviate the doubt that would otherwise exist as to whether all members of the jury had found the

defendant guilty of the same offense." *Savoires*, 430 F.3d at 380. And the government correctly distinguishes *Savoires* from our case. In *Savoires,* the district court erroneously instructed the jury that it could find defendant "guilty of an 'offense'—possession of a firearm during and in relation to a drug trafficking crime—that is not criminalized by § 924(c)." *Id.* Here, the district court instructed: "Second, that the defendant knowingly used or carried or possessed a firearm. Third, that the use or carrying of the firearm was during and in relation to the [drug-trafficking offense] or that the possession of the firearm was in furtherance of the [drug-trafficking offense] charged . . . ." Thus, because these instructions did not criminalize a non-existent crime, they did not suffer from the same defect as in *Savoires*. *See United States v. Lloyd*, ___ F.3d ___, No. 04-4014, 2006 WL 2389338, at *3 (6th Cir. Aug. 18, 2006).

But this difference alone does not end our analysis because the court never gave a unanimity limiting instruction. *See Davis*, 306 F.3d at 416 (citing *United States v. Nattier*, 127 F.3d 655, 657-58 (8th Cir. 1997) (finding limiting instruction sufficient to cure duplicity)); *Lloyd*, at ___ F.3d ___, 2006 WL 2389338 at *3 (noting that concern about the jury unanimously finding the defendant guilty of a specific offense was not dispensed with because the "district court did not explicitly direct the jury that unanimity on either the use or possession offense was necessary to a guilty verdict"). In other words, while these instructions did not compound the confusion, they did not necessarily cure the duplicity.

Thus, as in *Lloyd*, we examine whether the verdict form cured any doubt that the jury reached a unanimous verdict on one of the offenses. In *Lloyd*, "the verdict form provided to the jury made no mention at all of the possession offense. Instead, the verdict form which was signed by each juror stated that the jury found [defendant] guilty of 'carrying or using, and brandishing, a firearm during the commission of a crime of violence.'" *Id*. Thus, the verdict form left no doubt that the jury had unanimously convicted on the "carry or use" offense. Here, however, the verdict form read:

> As to Count Seven of the Third Superseding Indictment charging a violation of 18 U.S.C. § 924(c)(1) (using or carrying a firearm during and in relation to a drug trafficking crime as set forth in **Count Six** or possessing a firearm in furtherance of the same drug trafficking crime) . . .

From this verdict form, unlike in *Lloyd*, we simply cannot discern, and can only speculate about, *which* offense the jury's unanimous guilty verdict applied to. Neither the jury instructions nor the verdict form "alleviate the doubt that would otherwise exist as to whether all members of the jury had found the defendant guilty of the same offense." *Savoires*, 430 F.3d at 380. Therefore, the duplicity in the indictment constituted plain error and prejudiced List's substantial right. *See, e.g.*, *id.* at 381. And the remaining doubt as to whether the jury unanimously convicted List of either of the two offenses undermines the fairness of his trial and warrants reversal on Count Seven. *Id*.

### 3. Severance

List's third challenge focuses on the district court's denial of his motion to sever the conspiracy count from the attempted possession of cocaine and related firearm count. Specifically,

he argues that the evidence pertinent to proving the conspiracy count differed completely and would not have been admissible at a trial on the other counts. We review a district court's severance ruling only for an abuse of discretion. *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005).

Federal Rule of Criminal Procedure 8(a) permits joinder of two or more offenses that "are of the same or similar character or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Here, the district court did not abuse its discretion in denying List's motion because the offenses were of a "similar character . . . connected with or constitut[ing] parts of a common scheme or plan": (1) the three charges centered around the sale of cocaine; (2) Danny Gibson's sale of cocaine—the basis of Counts Six and Seven—occurred within the time frame of the conspiracy; and (3) Danny Gibson's recorded conversations discussing the November 2001 drug deal with List also detailed the cocaine-trafficking activities of List and his coconspirators Roy Gibson and Pennington.

List also argues that a single trial of these counts prejudiced him. Under Federal Rule of Criminal Procedure 14(a), a court may grant relief from prejudicial joinder by ordering separate trials of separate counts. But before the court will order separate trials, List must show "compelling, specific, and actual prejudice from a court's refusal . . . to sever." *Saadey*, 393 F.3d at 678. List has failed to do so. He argues that the evidence to prove Counts Six and Seven—particularly Patrick McAbee's "other acts" testimony (discussed below)—would not have been admissible in a separate trial of Count One because it did not prove the existence of the conspiracy. Yet, McAbee's

testimony described the sale of the same types of drugs, and these sales occurred during the time frame of the conspiracy. Moreover, Counts Six and Seven relate to a single incident, List's November 2001 drug arrest; the jury could distinguish the evidence related to these charges from that used to prove the conspiracy count. The district court did not abuse its discretion in denying List's motion to sever the counts.

## 4. Patrick McAbee's Testimony

List next attacks the trial court's admission of Patrick McAbee's "other acts" testimony under Federal Rule of Evidence 404(b) related to the sale and purchase of cocaine and marijuana between McAbee and List. List did not contemporaneously object to McAbee's testimony nor did he object to the court's failure to balance the probative value of McAbee's testimony against its prejudicial effect immediately before, during, or after McAbee's testimony. Rather, he filed a pretrial motion in limine in which he moved

> pursuant to Rules 403 and 404(b) of the Federal Rules of Evidence, [for the Court] to enter an Order prohibiting the introduction of evidence of the Defendant's prior crimes, wrongs or acts until such time as the Court determines on-the-record and out of the presence of the jury that the probative value of such evidence is substantially outweighed by its prejudicial effect.

The district court denied this motion, never conducted the requested balancing, and admitted McAbee's testimony. List claims that filing the pretrial motion in limine preserved his objection. Yet "[i]n the absence of a contemporaneous objection we must apply a 'plain error' standard of

review [because] . . . a motion in limine does not preserve evidentiary questions for appeal." *United States v. Kelly*, 204 F.3d 652, 655 (6th Cir. 2000).

Under Federal Rule of Evidence 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes . . . ." To admit Rule 404(b) evidence, a district court must ask (1) "whether there is sufficient evidence that the other act in question actually occurred"; (2) "if so, . . . whether the evidence of the other act is probative of a material issue other than character"; and (3) "whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect." *United States v. Jenkins*, 345 F.3d 928, 937 (6th Cir. 2003). List invokes only the third part of this analysis and complains that the district court failed to make the requested on-the-record finding that the probative value of McAbee's testimony (to prove intent) outweighed its prejudicial effect.

Our review demonstrates, however, that though the district court failed to articulate, either explicitly or implicitly, whether the probative value of McAbee's testimony was substantially outweighed by its prejudicial effect, the overwhelming evidence of List's guilt on Counts Six and Seven renders any error harmless. *See United States v. Murphy,* 241 F.3d 447, 453 (6th Cir. 2001) (finding "any error, if any, in admitting evidence of 'other acts' is harmless in light of the overwhelming evidence of Defendant's guilt"). Here, telephone recordings and testimony documented the events leading up to the November 2001 drug transaction between Danny Gibson

and List. Agents monitored the drug transaction and recovered cocaine and a loaded handgun on List immediately after he exited Gibson's car.

Moreover, shortly after McAbee testified, the district court gave a limiting instruction: "If you find defendant did those acts, you can consider the evidence only as it relates to the defendant's intent. You must not consider it for any other purpose." This clear instruction limited any prejudice. *United States v. Johnson*, 27 F.3d 1186, 1193 (6th Cir. 1994) ("[I]t is important that the jurors then be clearly, simply, and correctly instructed concerning the narrow and limited purpose for which the evidence may be considered."). Therefore, any error, plain or otherwise, did not affect List's substantial rights.

### 5. Coconspirator Statements

List's next evidentiary challenge focuses on Danny Gibson's testimony that (1) Roy Gibson told him that List was "all right" and could be trusted, and (2) Roy told him that List had taken part in a "rip off" of 100 pounds of marijuana from Roy. This court reviews for clear error the district court's factual findings regarding the conspiracy but reviews de novo the trial court's legal determinations admitting coconspirator testimony based on those factual findings. *United States v. Gessa*, 971 F.2d 1257, 1261 (6th Cir. 1992). According to List, the district court never found that a conspiracy existed, that List was a member of the conspiracy, or that any coconspirator statements furthered the conspiracy. Rather, List contends that Danny's statements to Roy were "idle chatter."

Under Federal Rule of Evidence 801(d)(2)(E), "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. Such a statement is admissible if a preponderance of the evidence shows: (1) a conspiracy existed, (2) the defendant against whom the statement is offered was a member of the conspiracy, and (3) the statement was made in the course of and in furtherance of the conspiracy. *United States v. Wright*, 343 F.3d 849, 866 (6th Cir. 2003).

Here, ample evidence—including List's own statements to DEA agents in 1999 and taped recordings where List himself described the conspiracy and its members—shows that a drug-trafficking conspiracy existed and that List was a member of that conspiracy. Moreover, Roy's statements that List was "all right" and that Roy and List were involved in the cocaine trade reassured Danny about List's trustworthiness and furthered the conspiracy. *See, e.g.*, *United States v. Monus*, 128 F.3d 376, 393 (6th Cir. 1997) (finding that statements made to "quell . . . fears" of a coconspirator were made to further conspiracy). The statements regarding List's alleged "rip-off" of 100 pounds of marijuana kept Danny abreast of Roy's and List's drug-trafficking activities. *See, e.g.*, *United States v. Rios*, 842 F.2d 868, 874 (6th Cir. 1988) (explaining statements "made to keep a co-conspirator abreast of [another] co-conspirator's activities" further a conspiracy). The district court properly admitted these coconspirator statements.

6. Withdrawal from Conspiracy

List also argues that (1) the only evidence of his drug dealing with Roy occurred outside the five-year statute of limitations for conspiracy and (2) he withdrew from the alleged conspiracy more than five years before being indicted. In other words, counting backward five years from the indictment date (November 16, 2004), List figures that if he can demonstrate that insufficient evidence exists as to his involvement in the drug conspiracy after November 16, 1999, or if he can show that he withdrew from the conspiracy before that date, he can establish that the court erred by not granting his motion for acquittal. Whether an indicted crime falls within the statute of limitations is a jury question. *United States v. Brown*, 332 F.3d 363, 372-74 (6th Cir. 2003). "Where a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." *Rios*, 842 F.2d at 873.

List's first argument fails because sufficient evidence—including List's numerous telephone contacts with Roy Gibson in 2000 and the recorded statements by Danny Gibson—permitted the jury to conclude that List continued to conspire within the statute of limitations time frame. *Brown*, 332 F.3d at 372-74 (6th Cir. 2003) (finding that after a defendant joins a drug conspiracy, it is presumed that the conspiracy continues). And List did not even attempt to show that the conspiracy terminated.

Second, List contends that he took affirmative steps to withdraw from the conspiracy when he met with Agent Lewis in September 1999, informed Lewis about Roy Gibson's drug-trafficking activities, and offered to participate in the DEA investigation of Roy. List bears the burden of showing his withdrawal from the conspiracy. *Id.* at 373. Again, the government presented sufficient evidence to allow a jury to find that List failed to carry this evidentiary burden. For example, List made no full confession to Lewis about his own activities and did not clearly indicate to his coconspirators that he was abandoning the conspiracy. *Id*. at 373-74 (noting that either of these steps would be sufficient affirmative evidence of withdrawal, but that mere cessation of activity is insufficient to establish withdrawal). On the contrary, after the cooperation attempt failed because List refused to wear a wire, the record shows that List continued to contact Roy Gibson, as evidenced by telephone records from 2000, and participated in the cocaine trade described in the Danny Gibson-List tapes. Sufficient evidence permitted a jury to conclude that List continued to participate in the conspiracy after the five-year statute of limitations began to run, and that he never withdrew from the conspiracy. Therefore, the district court properly denied List's motion for acquittal.

### 7. Edward Workman Testimony

Next, List claims that the district court abused its discretion when it failed to declare a mistrial after the testimony of Dr. Edward Workman (List's treating physician) and the cross-examination of List's witness, Dr. Pamela Jones. "We review for abuse of discretion the district court's denial of a motion for mistrial." *United States v. Martinez*, 430 F.3d 317, 336 (6th Cir.

2005).  At trial, List's counsel objected on the grounds of surprise to Dr. Workman testifying as an expert to rebut Dr. Jones's testimony that List told her that he took possession of the cocaine, not with the intent to distribute it, but to commit "suicide by cop."[2]  The government responded that it would call Dr. Workman as a fact witness to explain that List made no mention of suicide, and the trial court authorized Dr. Workman to testify as a fact witness only. When Dr. Workman testified on matters within his medical expertise, beyond the scope permitted, the trial court struck all of Dr. Workman's testimony and specifically instructed the jury not to rely on the impermissible statements.  The court also denied the government's request to call Dr. Workman in its rebuttal case because Dr. Workman went beyond mere fact testimony and gave expert opinion.

List claims the court should have declared a mistrial because:  (1) the government acted in bad faith by not notifying him of its intent to call Dr. Workman as an expert; (2) the government's questioning was unreasonable because it asked Dr. Workman about topics—such as the definition of psychosis and his assessment of List's suicide risk—that went beyond mere fact testimony; (3) the trial court failed to give an immediate, clear, and forceful limiting instruction; and (4) the testimony was more than a small portion of the government's case. *See United States v. Forrest*, 17 F.3d 916, 920 (6th Cir. 1994).

---

[2]To commit "suicide by cop" is to act in a way that would require law enforcement officers to respond with lethal force.

Although the district court found that Dr. Workman provided expert testimony, it concluded that the government did not act in bad faith. (Dr. Workman "obviously offered expert testimony regardless of whether it was intended to elicit such expert testimony. I am not finding that was the intent.") Moreover, the court gave an immediate, clear, and forceful limiting instruction. ("I am going to strike from the record Workman's testimony in its entirety. You [the jury] are not to, you are to disregard that testimony in its entirety. You are not to bring it up in any fashion in your jury deliberations or have any bearing on your deliberations or decision making process or decision in the case.") We presume that the jury followed the instructions given. *See Washington v. Hofbauer*, 228 F.3d 689, 706 (6th Cir. 2000). Finally, in light of the other evidence, Dr. Workman's testimony was a small piece of the government's case.

Moreover, the district court did not abuse its discretion by refusing to declare a mistrial after the government cross-examined Dr. Jones about her notes referencing Dr. Workman. Dr. Jones's answers only bolstered List's "suicide by cop" defense: she testified that List told Dr. Workman that he had "suicidal ideation." ("It was Mr. List telling me that Workman referred him on because he had become more depressed and suicidal.") Thus, the district did not abuse its discretion by denying List's motions for a mistrial.

### 8. Special Agent Lewis as Expert Witness

Next, List asserts that the trial court abused its discretion by allowing DEA Agent Lewis to testify as an expert about drug-trafficking operations. *See United States v. Bender*, 265 F.3d 464,

472 (6th Cir. 2001) ("A district court's admission of expert testimony, however, will not be disturbed unless the district court abused its discretion."). Agent Lewis testified about how much drugs are worth on the street, how drug dealers sometimes use code words to disguise their transactions, how possession of large drug quantities indicates commercial rather than personal use, how drugs are packaged and shipped, and how drug dealers typically use and carry firearms. This court has held that drug-enforcement agents may testify as experts on the operations and characteristics of drug-trafficking organizations. *See United States v. Swafford*, 385 F.3d 1026, 1030 (6th Cir. 2004) (allowing such testimony "as long as appropriate cautionary instructions are given, since knowledge of such activity is generally beyond the understanding of the average layman"); *Combs*, 369 F.3d at 940. Here, the district court did not abuse its discretion because Agent Lewis, a qualified law enforcement agent with 22 years of experience and extensive drug-investigation training, testified about illegal drug operations information beyond the ken of the average layman, and the district court gave the usual cautionary instruction regarding expert testimony.

## III

Accordingly, we vacate the conviction on Count Seven and remand for proceedings consistent with this opinion. We affirm the district court judgment in all other respects.