[Cite as *Stevens v. Maxson*, 2013-Ohio-5792.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Dean Stevens, | : | |
| Plaintiff-Appellee, | : | No. 12AP-672 |
| | | (C.P.C. No. 11CVC-07-9008) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Debra Maxson et al., | : | |
| Defendants-Appellants. | : | |

---

D E C I S I O N

Rendered on December 31, 2013

---

*David A. Goldstein Co., LPA, David A. Goldstein*, and *Seth K. Kleinman*, for appellee.

*Richard C. Pfeiffer, Jr.*, City Attorney, *Wendy J. Esposito*, and *Paula J. Lloyd*, for appellants.

---

APPEAL from the Franklin County Court of Common Pleas.

BROWN, J.

{¶ 1} This is an appeal by defendants-appellants, Debra Maxson and the City of Columbus ("city"), from a judgment of the Franklin County Court of Common Pleas denying appellants' motion for summary judgment on the issue of political subdivision tort immunity.

{¶ 2} On August 8, 2008, a police cruiser operated by appellant, Columbus Police Officer Debra Maxson (individually "Officer Maxson"), was involved in a collision with a motorcycle operated by plaintiff-appellee, Dean Stevens. Officer Maxson was initially stopped at a red light in the southbound left-turn lane of Cleveland Avenue, preparing to turn east onto State Route 161. While waiting on the light, Officer Maxson observed a

woman across the intersection standing outside of a vehicle in the median area of Cleveland Avenue, waving her arms and attempting to get the officer's attention. The woman was screaming and appeared to be crying. Officer Maxson determined that the woman needed assistance, so the officer activated the cruiser's overhead lights and, at the least, periodically sounded her air horn. Officer Maxson made it across the westbound lanes of State Route 161 without incident but, while crossing the eastbound lanes, her cruiser struck appellee's motorcycle as he was traveling in the eastbound, southernmost non-turning lane of State Route 161.

{¶ 3} On July 21, 2011, appellee filed a complaint against the city and Officer Maxson (collectively "appellants"), alleging causes of action for negligence, willful, wanton and/or reckless misconduct, and respondeat superior. On May 24, 2012, appellants filed a motion for summary judgment. Attached to the motion were affidavits of Racquel Hickman and Officer Maxson, as well as the deposition testimony of Officer Maxson. Appellee filed a memorandum contra appellants' motion for summary judgment.

{¶ 4} On May 25, 2012, appellee filed a motion for partial summary judgment. Attached to the motion were various documents, including the depositions of appellee, Officer Maxson and Columbus Police Officer Mark Rice, and the affidavit of Stephen M. Ashton, an accredited accident reconstructionist. The city filed a memorandum contra appellee's motion for partial summary judgment.

{¶ 5} On July 31, 2012, the trial court filed a decision and entry denying appellants' motion for summary judgment and denying appellee's motion for partial summary judgment. In denying appellee's motion, the court determined that Officer Maxson was on an emergency call at the time of the collision. With respect to the issue of the city's liability, the trial court found no evidence that the conduct of its employee (Officer Maxson) was willful, but the court determined that genuine issues of material fact remained as to whether the officer's actions constituted wanton misconduct. Further, as to the issue of employee immunity, the court found that genuine issues of material fact remained as to whether Officer Maxson's actions were wanton or reckless.

{¶ 6} On appeal, appellants set forth the following two assignments of error for this court's review:

First Assignment of Error

The Trial Court erred in denying the City immunity from liability pursuant to R.C. 2744.02(B)(1)(a).

Second Assignment of Error

The Trial Court erred in denying Officer Maxson immunity from liability pursuant to R.C. 2744.03(A)(6)(b).

{¶ 7} Appellants' assignments of error are interrelated and will be addressed together. Under these assignments of error, appellants contend the trial court erred in failing to find the city had a full defense to liability, pursuant to R.C. 2744.02(B)(1), and in denying the city's employee, Officer Maxson, immunity based upon R.C. 2744.03(A)(6)(b).

{¶ 8} In general, the denial of a summary judgment motion is not a final, appealable order; however, "[w]hen a trial court denies a motion in which a political subdivision or its employee seeks immunity under R.C. Chapter 2744, that order denies the benefit of an alleged immunity and is therefore a final, appealable order pursuant to R.C. 2744.02(C)." *Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, syllabus.

{¶ 9} Pursuant to Civ.R. 56(C), summary judgment shall be granted if the filings in the action, including pleadings and affidavits, "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." This court's review of a trial court's decision on summary judgment is de novo. *Bonacorsi v. Wheeling & Lake Erie Ry. Co.,* 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24.

{¶ 10} In *Smith v. McBride,* 130 Ohio St.3d 51, 2011-Ohio-4674, ¶ 13-15, the Supreme Court of Ohio discussed the "three-tiered analysis" applied by courts in determining whether a political subdivision is immune from tort liability under R.C. Chapter 2744, holding in part:

The first tier involves the general grant of immunity of R.C. 2744.02(A)(1), which provides that "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function."

> Political subdivision immunity is not absolute, however. The second tier of the analysis focuses on the five exceptions to immunity listed in R.C. 2744.02(B), which can expose the political subdivision to liability. * * * In cases involving the alleged negligent operation of a motor vehicle by an employee of a political subdivision, the second tier of the analysis includes consideration of whether the specific defenses of R.C. 2744.02(B)(1)(a) through (c) apply to negate the immunity exception of R.C. 2744.02(B)(1). * * *
>
> If any of the exceptions to immunity of R.C. 2744.02(B) do apply, and if no defense in that section applies to negate the liability of the political subdivision under that section, then the third tier of the analysis requires an assessment of whether any defenses in R.C. 2744.03 apply to reinstate immunity.

{¶ 11} R.C. 2744.02(B)(1) "addresses the liability of a political subdivision and full defenses for the operation of a motor vehicle by employees." *Anderson v. Massillon,* 134 Ohio St.3d 380, 2012-Ohio-5711, ¶ 20. R.C. 2744.02(B)(1) provides in part that "political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority." R.C. 2744.02(B)(1)(a), however, provides a full defense to political subdivision liability when "[a] member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct."

{¶ 12} The three-tiered analysis regarding the potential liability of a political subdivision "does not apply when determining whether an employee of the political subdivision will be liable for harm caused to an individual." *Mashburn v. Dutcher,* 5th Dist. No. 12 CAE 010003, 2012-Ohio-6283, ¶ 33, citing *Cramer v. Auglaize Acres,* 113 Ohio St.3d 266, 2007-Ohio-1946, ¶ 17. Rather, R.C. 2744.03(A)(6) "sets forth the immunity of political-subdivision employees and the exceptions thereto." *Anderson* at ¶ 21. As relevant for purposes of the instant action, R.C. 2744.03(A)(6)(b) provides immunity for an employee of a political subdivision who acts within the scope of his or her

duties unless "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 13} Accordingly, under the applicable statutes, "the General Assembly set forth different degrees of care that impose liability on a political subdivision or on an employee of a political subdivision." *Anderson* at ¶ 23. Specifically, "[t]he legislature expressly stated that a political subdivision has a full defense to liability when the conduct involved is not willful or wanton, and therefore, if the conduct is only reckless, the political subdivision has a full defense to liability." *Id.* Further, "the legislature expressly removed immunity from employees of a political subdivision for wanton or reckless conduct in R.C. 2744.03(A)(6)(b). By implication, an employee is immune from liability for negligent acts or omissions." *Id.*

{¶ 14} In *Anderson,* the Supreme Court recently clarified that "[t]he terms 'willful,' 'wanton,' and 'reckless' as used in these statutes are not interchangeable." *Id.* at ¶ 40. In so holding, the court set forth the following definitions:

> Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury. * * *; *see also Black's Law Dictionary* 1630 (8th Ed.2004) (describing willful conduct as the voluntary or intentional violation or disregard of a known legal duty).
>
> Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result. * * *; *see also Black's Law Dictionary* 1613-1614 (8th Ed.2004) (explaining that one acting in a wanton manner is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results).
>
> Reckless conduct is characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct. * * * adopting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965); *see also Black's Law Dictionary* 1298-1299 (8th Ed.2004) (explaining that reckless conduct is characterized by a substantial and unjustifiable risk of harm to others and a

> conscious disregard of or indifference to the *risk,* but the actor does not desire harm).

(Emphasis sic.) *Anderson* at ¶ 32-34.

{¶ 15} Turning to the record in the instant case, the evidence before the trial court on summary judgment included various depositions, affidavits, and other materials. In her deposition, Officer Maxson stated she was on patrol on the morning of August 8, 2008 and that her cruiser was stopped in the southbound, left-turn lane of Cleveland Avenue. The officer was preparing to turn east onto State Route 161 (also known as Dublin-Granville Road). The traffic signal was red for vehicles traveling north or south on Cleveland Avenue. While waiting for the light to change, Officer Maxson observed a woman across the intersection, later identified as Racquel Hickman, attempting to get the officer's attention. The woman was standing "in the median" area of Cleveland Avenue, directly across from the officer. (Maxson Depo. 19.) She "looked like she had been crying," and the officer heard her "screaming." (Maxson Depo. 19.) The woman was "pointing at a vehicle she was standing near." (Maxson Depo. 25.)

{¶ 16} Upon seeing the woman, Officer Maxson "looked at the guy next to me on my right. He acknowledged me. I flipped my lights and siren, and I went a little bit into the intersection." (Maxson Depo. 24.) Officer Maxson testified that, after turning on the cruiser's lights and siren, "I started creeping into the intersection. And I got eye contact with most of the drivers before I moved on, just creeping over, each time blowing my air horn." (Maxson Depo. 26-27.) She described her actions as "[c]reeping and slowing down, creeping and slowing down." (Maxson Depo. 40.) Officer Maxson also made eye contact with a motorist to her left in the westbound lane of State Route 161. The officer radioed her location to a dispatcher before starting to cross the intersection. According to Officer Maxson, "[a]ll vehicles were stopped and letting me through." (Maxson Depo. 47.) Upon entering the eastbound lanes of State Route 161, the officer's cruiser struck appellee's motorcycle. Officer Maxson did not see the motorcycle prior to the collision. The officer testified she was "watching the lady" immediately prior to impact with appellee's motorcycle. (Maxson Depo. 45.)

{¶ 17} Officer Maxson did not recall the amount of time that elapsed between her activation of the cruiser's overhead lights and the collision, nor did she remember how many times she toggled the air horn while crossing the intersection. The officer could not recall whether she applied her brakes prior to the cruiser's impact with the motorcycle. The officer stated she did not increase her speed while proceeding through the intersection, and she estimated that her maximum speed at the time was "less than 5, about 3" miles per hour ("m.p.h."). (Maxson Depo. 42.)

{¶ 18} Racquel Hickman submitted an affidavit stating she was traveling north on Cleveland Avenue on the morning of August 8, 2008. As she approached the intersection of Cleveland Avenue and State Route 161, her vehicle was "hit from behind by a man in a green car." (Hickman Affidavit, ¶ 3.) After the collision, the driver of the green car "pulled around my vehicle in an attempt to leave the scene of the accident." (Hickman Affidavit, ¶ 4.) Hickman called the police to report the incident, but she then "noticed a police cruiser stopped at the light on the opposite side of Cleveland Avenue." (Hickman Affidavit, ¶ 5.) Hickman exited her vehicle and "waved to the police officer to get the officer's attention." (Hickman Affidavit, ¶ 6.) She also "gestured to the police officer by pointing at the green car that had just hit my vehicle." (Hickman Affidavit, ¶ 6.) Hickman "saw the flashing lights on the roof of the cruiser turn on and [she] heard the cruiser's siren." (Hickman Affidavit, ¶ 7.) Hickman observed the cruiser enter the intersection "and then pause before proceeding through the intersection." (Hickman Affidavit, ¶ 8.) As the cruiser continued through the intersection, Hickman "saw all vehicles come to a stop except for a motorcycle" traveling east on State Route 161. (Hickman Affidavit, ¶ 9.) The motorcycle and cruiser collided in the intersection of Cleveland Avenue and State Route 161.

{¶ 19} In his deposition testimony, appellee related that he was driving to work on a motorcycle on the date of the accident, traveling east on State Route 161 "through the intersection of Cleveland Avenue." (Appellee Depo. 24-25.) According to appellee, there were vehicles in all of the other eastbound lanes of State Route 161, and he "clearly had a green light." (Appellee Depo. 25.) Appellee estimated he was traveling 45 m.p.h. through the intersection. He "slowed down" as he proceeded through the intersection, but the officer's cruiser suddenly appeared and there was "no chance of stopping." (Appellee

Depo. 25.)  Appellee applied his brake, but the cruiser's front bumper "hit me right in my left side."  (Appellee Depo. 25.)  He first observed the police cruiser at the point of impact, at which time appellee "was through the intersection at least halfway or more."  (Appellee Depo. 29.)  Following the collision, Officer Maxson came over to him, and appellee "asked her specifically why she didn't have a siren or horn on."  (Appellee Depo. 31.)

{¶ 20} The Columbus Division of Police conducted an internal investigation regarding the accident, and Columbus Police Sergeant Robert D. Laird ("Sgt. Laird") prepared an intra-divisional memorandum, dated August 13, 2008.  As part of his investigation, Sgt. Laird interviewed Officer Maxson, Hickman, and two other motorists who were near the intersection at the time of the accident.  Sgt. Laird made a finding that "Officer Maxson was **not at fault** for the crash." (Emphasis sic.)  According to Sgt. Laird, the officer "exercised due care and diligence utilizing the cruiser emergency lights and audible air horn as she entered the intersection against the red traffic signal."  Sgt. Laird noted that the "operator of the motorcycle was not cited for failing to yield due to the complexity of the scene and the possibility that stopped traffic may have blocked the motorcyclist's view."

{¶ 21} A second intra-divisional memorandum, dated September 15, 2008, was prepared by Columbus Police Lieutenant William Morrison ("Lt. Morrison").  In his report, Lt. Morrison stated that his findings of the accident "differ from the investigating supervisor and the officer's immediate supervisor."  Specifically, Lt. Morrison disagreed with Sgt. Laird's statement that Officer Maxson "exercised due care and diligence utilizing the cruiser emergency lights and audible air horn as she entered the intersection against the red traffic signal."  Lt. Morrison noted that the officer "entered a very large, busy intersection during rush hour traffic.  Officer Maxson should have, at the very least, used her lights and siren to cross the intersection and not just hit her air horn a couple of times. Several of the witnesses never heard the air horn."  Lt. Morrison recommended the following: "**Documented Constructive Counseling** for Officer Maxson out of this accident.  I make my decision based on the Fleet Safety Manual, Section IV, C, 4, which states, 'No violation of law, but there is indication that the operator of the police vehicle was careless or evidence of contributory negligence on the part of the driver.' " (Emphasis sic.)

{¶ 22} The Fleet Safety Committee/Pursuit Review Committee ("Fleet Safety Committee") subsequently issued a finding that Officer Maxson was at fault for violating Rule of Conduct 1.11. On October 22, 2008, Officer Maxson filed an appeal from the decision of the Fleet Safety Committee. On January 13, 2009, the Fleet Safety Committee denied the officer's appeal.

{¶ 23} Columbus Police Officer Mark Rice ("Officer Rice"), assigned to the department's accident investigation unit, is a member of the Fleet Safety Committee. He conducted a review of the accident, which included an examination of photographs and crash scene measurements. In his deposition, Officer Rice expressed his view that "the speed [Officer Maxson] was claiming, around 5 miles per hour at impact, was inaccurate, and her speed was actually something higher than that." (Rice Depo. 15.) Noting that the crash report indicated the motorcycle was traveling at 45 m.p.h., and that the cruiser was traveling at 5 m.p.h., Officer Rice opined: "When I looked at the crash scene measurements and photos, I saw that the departure angle of the motorcycle from impact was rather severe, which indicated to me that there was a significant exchange in momentum at the point of impact." (Rice Depo. 15.) According to Officer Rice, "[h]ad there been less speed on the cruiser, I would not have seen such a severe angle of departure on the motorcycle." (Rice Depo. 15-16.)

{¶ 24} Stephen M. Ashton, an accredited accident reconstructionist, averred in an affidavit that he had reviewed various documents, including (1) the "Ohio Traffic Crash Report," (2) the deposition transcript of Officer Maxson, (3) the deposition transcript of appellee, (4) the deposition transcript of Officer Rice, (5) the "Intra-Divisional Investigation file," (6) the "Columbus Division of Police Measurement Date Log prepared by Detective Steven Boggs," (7) the Columbus Police Department's "Standard Operating Procedures Manual," and (8) "Columbus Police Division Directive 3.27." (Ashton Affidavit, ¶ 3.)

{¶ 25} Based upon his review of the subject materials, Ashton opined that Officer Maxson's vehicle was traveling at a rate of speed of between 27 and 34 m.p.h. at the time of the collision. Ashton further opined that Officer "Maxson's claim that she was driving 5 m.p.h. is clearly inaccurate because if she had been she would have been able to bring her

vehicle to a stop in less than one (1) foot and, if she were paying attention, the accident would not have occurred." (Ashton Affidavit, ¶ 4.)

{¶ 26} As noted, the trial court, in addressing the issue of political subdivision liability, found no evidence that Officer Maxson engaged in willful misconduct, but the court determined that genuine issues of material fact remained as to whether the actions of Officer Maxson amounted to wanton misconduct. Further, with respect to the issue of employee immunity, the court found that genuine issues of fact existed as to whether the officer's actions were wanton or reckless.

{¶ 27} As set forth above, the term "willful misconduct" is defined as that which "implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Anderson* at ¶ 32. The evidence on summary judgment does not permit a finding that Officer Maxson exhibited an intentional deviation from a clear duty, or a deliberate purpose not to discharge some duty, or purposely doing wrongful acts with knowledge of the likelihood of resulting injury. Accordingly, we agree with the trial court that there is no evidence suggesting the officer willfully harmed appellee.

{¶ 28} We next consider the issue of "wanton misconduct." In analyzing this issue, the trial court cited the competing evidence presented by the parties. Specifically, the court noted that the city and Officer Maxson "put forth evidence that [the officer] made eye-contact with drivers that would otherwise cross her path, activated her cruiser's lights and siren, and intermittently activated her air horn." The trial court also noted Officer Maxson's deposition testimony that she "proceeded cautiously into the intersection," as well as the officer's statement "she was '[c]reeping and slowing down, creeping and slowing down.' " Finally, the trial court cited evidence by the city and Officer Maxson that the speed limit on State Route 161 was 45 m.p.h.

{¶ 29} The trial court also set forth the primary evidence relied upon by appellee, including the internal investigation report of Lt. Morrison, indicating that Officer Maxson entered a large, busy intersection during rush hour traffic, and Lt. Morrison's statement that the officer "should have, at the very least, used her lights and siren to cross the intersection and not just hit her air horn a couple of times. Several of the witnesses never

heard the air horn."  The trial court observed that "[t]his supports the inference that Officer Maxson did not activate her siren."  The trial court also cited the affidavit of appellee's accident reconstructionist, who concluded that Officer Maxson was traveling between 27 and 34 m.p.h. at the time her cruiser struck appellee's motorcycle.

{¶ 30} In analyzing this evidence, the trial court determined that Officer Maxson exercised some care for those cars traveling in the westbound lane of State Route 161, but not for vehicles in appellee's (eastbound) lane of traffic.  The trial court found that the evidence, construed most strongly in favor of the non-moving party, indicated that Officer Maxson, as she began crossing the intersection against a red light from a stopped position, signaled to drivers only via her overhead lights and intermittent use of the cruiser's air horn, and that several witnesses did not hear the air horn.  Further, by the time the officer was crossing the eastbound lanes of State Route 161, she was nearing the impact speed of 27 to 34 m.p.h., requiring "fairly quick acceleration considering her testimony that she crept across the intersection and used her brakes."  The court observed that, because the officer "did not see [appellee] (or any vehicle stopped in his lane of travel), she should have exercised more caution rather than less" to have some assurance that cross traffic would not enter her path of travel.  The court concluded that a genuine issue of material fact existed as to whether the officer's conduct in accelerating through a large, busy intersection during rush hour, "without any evidence that cross-traffic traveling at 45 mph had stopped in [appellee's] lane of travel," constituted wanton misconduct.

{¶ 31} Based upon this court's de novo review of the evidence, we disagree with the trial court's determination that a genuine issue of material fact exists as to whether the actions of the officer constituted wanton misconduct.  As set forth above, wanton misconduct involves the failure to exercise "any care" toward those to whom a duty of care is owed if the circumstances are such that there exists a "great probability" that harm will result.  *Anderson* at ¶ 33.  Our main disagreement with the trial court's analysis of the evidence on summary judgment turns on its determination that Officer Maxson failed to exercise any care for vehicles traveling eastbound on State Route 161.

{¶ 32} In reaching this determination, we note the primary grounds relied upon by appellee for asserting a genuine issue of material fact on the question of wanton

misconduct. Specifically, appellee contends disputed evidence exists as to: (1) what warnings Officer Maxson gave as she entered the intersection, (2) whether the officer made an effort to observe drivers in appellee's lane of traffic as she entered the intersection, and (3) the speed the officer was traveling (and whether the vehicle was accelerating) at the time of the collision.

{¶ 33} As to the issue of warnings given by Officer Maxson, as set forth under the facts, the officer testified that she activated her overhead lights and siren before proceeding,[1] and periodically sounded the cruiser's air horn (by means of a toggle switch) as she entered the intersection area. Hickman, an eyewitness to the accident, stated in her affidavit that she "saw the flashing lights on the roof of the cruiser turn on," and she "heard the cruiser's siren." In response to this evidence, appellee cites his own deposition testimony that he did not hear a siren or see any lights. Specifically, appellee related that, immediately following the accident he was dazed for "a few seconds," and that when Officer Maxson came over to offer assistance he "asked her specifically why she didn't have a siren or horn on." (Appellee Depo. 31.)

{¶ 34} Appellee, however, also testified he did not observe the cruiser at any time prior to impact. Appellee's testimony that he failed to see emergency lights or hear a siren prior to impact does not preclude a defense of immunity for the city in light of the statement of Hickman, an independent witness, corroborating the officer's testimony that she utilized the vehicle's overhead emergency lights and siren. *See Byrd v. Kirby,* 10th Dist. No. 04AP-451, 2005-Ohio-1261, ¶ 24 (testimony of plaintiffs indicating they did not hear siren or see emergency lights prior to collision insufficient to oppose, for purposes of summary judgment, testimony of independent witnesses who affirmatively stated that lights and siren were activated; plaintiffs both testified they did not notice the cruiser prior to accident, and thus could not affirmatively rebut evidence that emergency lights and siren were activated). *See also Perlberg v. Cleveland,* 8th Dist. No. 91913, 2009-Ohio-1788, ¶ 26 ("Despite Perlberg's deposition testimony that he could not see the Ambulance or hear its siren, we do not find the facts preclude a defense of immunity for the City").

---

[1] Officer Maxson testified that the siren is automatically activated when the emergency lights are turned on.

{¶ 35} Construing the facts in favor of appellee for purposes of summary judgment, appellee's accident reconstructionist placed the speed of the officer's cruiser between 27 and 34 m.p.h. at the time of impact, therefore giving rise to an inference that the officer was apparently accelerating, rather than slowing down, as she entered appellee's lane of travel. Further, the evidence arguably supports appellee's contention that the officer did not make "eye contact" with drivers in the eastbound lane of State Route 161. In her deposition testimony, Officer Maxson indicated that she made eye contact "with most of the drivers before I moved on, just creeping over, each time blowing my air horn." (Maxson Depo. 26.) When questioned more specifically about which drivers she made eye contact with, Officer Maxson noted that she looked at the driver "next to me on my right. He acknowledged me." (Maxson Depo. 24.) When asked about eye contact with any other drivers, the officer stated: "The one I remember would have been on my left on the westbound lane." (Maxson Depo. 28.) When asked whether she made "[a]ny other eye contact * * * with any other drivers," Officer Maxson responded: "No." (Maxson Depo. 28.)

{¶ 36} Here, construing the evidence and inferences most strongly in favor of appellee, including evidence that Officer Maxson was accelerating the vehicle across the intersection between 27 and 34 m.p.h. at the time of the collision, and further assuming the officer did not make eye contact with drivers in appellee's lane of travel, we nevertheless conclude that the officer's conduct did not rise to the level of wanton misconduct under Ohio law. As noted, Officer Maxson testified that she turned on the cruiser's lights and siren and operated the air horn at least several times as she entered the intersection, and Hickman provided corroborating statements that she "saw the flashing lights on the roof" and "heard the cruiser's siren." While Officer Maxson did not make eye contact with drivers in the eastbound lane, she testified that she did look in that direction as she started through the intersection, stating that "as soon as I hit the westbound area I did look over that way." (Maxson Depo. 47.) The officer acknowledged she did not see appellee's motorcycle, but she testified that "[a]ll vehicles were stopped and letting me through." (Maxson Depo. 47.)

{¶ 37} Hickman, who witnessed the collision, stated in her affidavit that she saw the police cruiser "pause before proceeding through the intersection." (Hickman

Affidavit, ¶ 8.) Hickman also stated in her affidavit that she "saw all vehicles come to a stop except for a motorcycle." (Hickman Affidavit, ¶ 9.) Hickman's reference to "all vehicles" makes no distinction between westbound and eastbound traffic, and there is no evidence any other vehicles traveling eastbound on State Route 161 entered the intersection at that time despite having a green light. We note that appellee himself acknowledged he was "the only one going through the intersection" immediately prior to the collision. (Appellee Depo. 72.)

{¶ 38} In considering the materials submitted on summary judgment, we cannot conclude that the evidence as to the actions of Officer Maxson show a "failure to exercise any care" whatsoever for vehicles traveling eastbound on State Route 161. *Anderson* at ¶ 33. We therefore find that the trial court erred in denying summary judgment to the city pursuant to R.C. 2744.02(B)(1)(a).

{¶ 39} We next turn to the issue of employee immunity.[2] At the outset, we recognize the trial court did not, at the time it rendered its decision, have the benefit of the Supreme Court's recent decision in *Anderson,* in which the court clarified that " '[w]illful,' 'wanton' and 'reckless' describe different degrees of care and are not interchangeable." *Anderson* at paragraph one of the syllabus. In its decision, the Supreme Court observed that, "[g]iven the cross-application of these terms in our case law, it is not surprising that Ohio appellate courts have reached the conclusion that the 'willful,' 'wanton,' and 'reckless' standards are 'functionally equivalent.' " *Id.* at ¶ 30.

{¶ 40} In addressing the issue of employee immunity, the trial court, understandably relying upon prior court pronouncements defining reckless and wanton in a "virtually identical manner," concluded that: "Because the Court believes a question of fact exists as to the City's liability and because 'wanton or reckless' misconduct under R.C. 2744.03(A)(6) may be viewed as the functional equivalent of 'willful or wanton

---

[2] We note that R.C. 2744.07(A)(1) "imposes a duty on a political subdivision to provide a defense for an employee in any civil action or proceeding to recover damages allegedly caused by acts or omissions of the employee in connection with a governmental or proprietary function." *Whaley v. Franklin Cty. Bd. of Commrs.*, 92 Ohio St.3d 574, 576. The political subdivision further has a "duty to indemnify and hold harmless an employee if a judgment is obtained against the employee for acts or omissions in connection with a governmental or proprietary function, provided the employee acted in good faith and within the scope of his or her employment or official responsibilities." *Lambert v. Clancy*, 125 Ohio St.3d 231, 2010-Ohio-1483, ¶ 11.

misconduct' under R.C. 2744.02(B)(1)(b), the Court also believes a question of fact exists as to whether Officer Maxson is liable for her actions." On appeal, appellants similarly rely upon pre-*Anderson* case law for the proposition that "reckless" and "wanton" are defined in a virtually identical manner. Thus, appellants maintain, as with wanton misconduct, reckless conduct involves an examination of whether the officer failed to exercise "any care" whatsoever. However, in light of the Supreme Court's clarification that these terms are not interchangeable, the question on appeal as to the issue of recklessness is whether the record permits an inference that the city's employee acted with a "conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* at ¶ 34.

{¶ 41} When viewed in a light most favorable to appellee, the record indicates that Officer Maxson approached a busy intersection during morning rush hour and intentionally proceeded against a red light across the westbound and then eastbound lanes of State Route 161 in an effort to reach Hickman, who was standing in the median area of Cleveland Avenue.[3] The officer was required to traverse five lanes of traffic in order to cross the eastbound lanes of State Route 161. Officer Maxson testified that she was familiar with the intersection at issue and was aware of heavy traffic at that intersection during morning rush hour. The officer was also aware of the presence of vehicles in most of the eastbound lanes at the time she began crossing the intersection. As previously noted, Officer Maxson did not recall making eye contact with drivers in the eastbound lanes of State Route 161 and she acknowledged not seeing appellee's motorcycle until impact. Upon crossing the westbound lanes of State Route 161, the officer accelerated the cruiser through the intersection, against a red light, at a speed of between 27 to 34 m.p.h.

{¶ 42} Upon review, the evidence contains disputed facts regarding the officer's conduct that preclude summary judgment as to the issue of recklessness. Here, the record contains conflicting evidence as to whether the officer slowed down or accelerated the

---

[3] We note that appellee has not challenged on appeal the trial court's determination that the officer was on an emergency run at the time of the incident, an issue addressed by the court in denying appellee's motion for partial summary judgment.

vehicle as she entered appellee's path of travel. There is also conflicting evidence with respect to the speed the cruiser was traveling as she entered the eastbound lanes of State Route 161 against a red light. While the officer stated she was traveling no more than 5 m.p.h., appellee's accident reconstructionist, Ashton, placed the cruiser's speed between 27 and 34 m.p.h. Ashton opined that if the cruiser had entered the intersection at 5 m.p.h., as the officer testified, she "would have been able to bring her vehicle to a stop in less than one (1) foot and, if she were paying attention, the accident would not have occurred." Officer Rice similarly believed the speed of the cruiser was something greater than 5 m.p.h. According to Officer Rice, had there been "less speed on the cruiser, I would not have seen such a severe angle of departure on the motorcycle." In its decision, the trial court also noted factual issues with respect to precautions taken by the officer to ascertain the presence of cross traffic from appellee's lane, especially in light of evidence that the officer "was accelerating * * * 27 mph to 34 mph through a very large, busy intersection during rush hour." On this point, while Officer Maxson testified that she looked toward the eastbound lanes as she initially began crossing the westbound lanes of State Route 161, the officer also stated that she was "watching the lady" (i.e., looking straight ahead rather than in the direction of possible oncoming traffic) immediately prior to impact with appellee's motorcycle. (Maxson Depo. 45.)

{¶ 43} Summary judgment is not appropriate where the resolution of a factual dispute depends in part upon the credibility of a witness, "[n]or is summary judgment the proper vehicle for weighing the evidence where only a trial on the merits can resolve the dispute." *Lindsay P. v. Towne Properties Asset Mgmt. Co., Ltd.*, 12th Dist. No. CA2012-11-215, 2013-Ohio-4124, ¶ 18. In the present case, viewing the conflicting evidence in a light most favorable to appellee, including factual disputes as to whether the officer was slowing down or accelerating through the intersection, the speed at which the cruiser was traveling through the intersection, and the precautions the officer took to ascertain oncoming traffic in appellee's lane, material issues of fact remain regarding the officer's conduct leading up to the collision that cannot be resolved on summary judgment. Rather, we conclude that the issue of whether the officer's actions were reckless, or merely negligent, should be properly reserved for the trier of fact. Accordingly, we find that the

trial court did not err in denying summary judgment in favor of the political subdivision's employee under R.C. 2744.03(A)(6).

{¶ 44} Based upon the foregoing, appellants' first assignment of error is sustained, the second assignment of error is overruled, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded to that court for further proceedings in accordance with law, consistent with this decision.

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

TYACK and SADLER, JJ., concur.

_____