[Cite as *Williams v. Columbus*, 2016-Ohio-7969.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Mikel Williams, | : | |
| Plaintiff-Appellee, | : | No. 16AP-269 |
| v. | : | (C.P.C. No. 14CV-13109) |
| City of Columbus, et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellants. | : | |

D E C I S I O N

Rendered on December 1, 2016

**On brief:** *Schiff & Associates Co., LPA, Terry V. Hummel,* and *Emily Valandingham*, for appellee. **Argued:** *Terry V. Hummel.*

**On brief:** *Richard C. Pfeiffer, Jr.*, City Attorney, and *Janet R. H. Arbogast*, for appellant. **Argued:** *Janet R. H. Arbogast.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Defendants-appellants, City of Columbus ("City") and Brandon Petry, a Columbus police officer, appeal from the denial of their motion for summary judgment rendered by the Franklin County Court of Common Pleas on March 10, 2016. Because we find no error in the trial court's conclusion that reasonable jurors could disagree about whether the officer in question drove his squad car in a "wanton" manner, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On December 15, 2014, plaintiff-appellant, Mikel Williams, filed a complaint in the Franklin County Court of Common Pleas alleging that Petry had caused a collision between them on November 21, 2013. The City and Petry filed an answer to the

No. 16AP-269

complaint on August 20, 2015.[1]  In the answer, the City admitted that a traffic collision occurred between Williams and Petry on November 21, 2013 in the area of Sullivant Avenue in Columbus, Ohio and that Petry was acting within the scope and course of his employment as a police officer when it occurred.  (Answer at 1.)

{¶ 3}  Having narrowed the scope of potential disagreements in the case, the City and Petry moved for summary judgment on November 20, 2015 primarily on the question of governmental immunity.  The defendants submitted three exhibits in connection with the motion for summary judgment, an affidavit from Petry, an affidavit from his sergeant, James Sheehan, and a copy of the dash cam video from Petry's patrol car.  (Ex. A, Nov. 20, 2015 Mot. for Summ. Jgmt.,[2] Petry Aff.; Ex. A-1, Dash Cam Video; Ex. B, Sheehan Aff.)  Petry explained in his affidavit that on November 21, 2013, shortly before 6 p.m., he was on his way to provide backup to another officer who had initiated a traffic stop on Sullivant Avenue just east of Belvidere Avenue.  (Ex. A, Petry Aff. at ¶ 2-4.)  He related that the street was dry, the weather was cloudy, and it was dark out.  *Id.* at ¶ 4.  He explained that he was in the process of attempting a U-turn with his flashing lights illuminated when Williams' van collided with his cruiser.  *Id.* at ¶ 5.

{¶ 4}  The video of the accident shows that it was, indeed, fully dark.  (Ex. A-1.) The video shows that Petry drove along Sullivant Avenue which, at the place where the accident occurred, is a four-lane road with no median or turn lane.  (Ex. A-1 at 17:41:20.) Petry drove in the left hand lane until he passed another police car engaged in a traffic stop on the opposite side of the road.  (Ex. A-1 at 17:41:23.)  A short distance past this point, he activated his flashing lights, veered into the right hand lane, and then, from the right hand lane, without first stopping or slowing significantly, attempted a left hand U-turn crossing all four lanes of traffic and the double-yellow line.  (Ex. A-1 at 17:41:25-17:41:33.)  Just two seconds elapsed between when Petry turned on his lights and when he began to turn the car and just seven seconds elapsed between when Petry turned on his lights and the collision occurred.  (Ex. A-1 at 17:41:26-17:41:33.)  Petry slowed from 25 to 20 miles per hour as he swerved into the right lane to begin the attempted U-turn, then

---

[1] The trial court granted leave to file a late answer. (Sept. 21, 2015 Leave to File Granted.)

[2] Petry's affidavit was originally  filed on November 20, 2015 without a signature, but a signed affidavit was filed on November 24, 2015 and substituted by court order on January 29, 2016 for the unsigned copy.

slowed further to 15 miles per hour as the car turned left, and finally slowed to 10 miles per hour as he traveled across the center line and oncoming lanes. (Ex. A-1 at 17:41:26-17:41:33.) However, he was unable to complete the U-turn in the space of four lanes and at no time did he stop until his patrol car was positioned broadside across the curb lane of oncoming traffic an instant before impact. *Id.* The video also shows that at the time Petry attempted the U-turn, a line of traffic was stopped on the other side of the road in the inside lane waiting to turn left and thus the opposing traffic's curb lane was screened from view at the point where he began the U-turn. (Ex. A-1 at 17:41:30; Nov. 20, 2015 Williams Dep. at 45-46, filed Feb. 22, 2016.) Williams was driving his minivan in the curb lane, and the video demonstrates that he became visible only approximately two seconds before the collision. (Ex. A-1 at 17:41:30-17:41:33.) Impact occurred, following an audible screech of tires, with the passenger side of the police car. *Id.*

{¶ 5} Both Petry and Sheehan's affidavits recount that Williams stated that he was not injured. (Ex. A, Petry Aff. at ¶ 6; Ex. B, Sheehan Aff. at ¶ 4.) On the video, a voice can be heard asking if the officer is "alright," and the officer can be heard asking if Williams is "alright" but Williams' reply is not audible. (Ex. A-1 at 17:41:56-17:42:01.) Then, approximately 13 minutes after the accident, an unidentified voice asks, "Sir, are you okay?" (Ex. A-1 at 17:54:25-17:54:29). A voice replies, "[r]ight now I am." *Id.* Both officers noted damage to Williams' van caused by the collision. (Ex. A, Petry Aff. at ¶ 7; Ex. B, Sheehan Aff. at ¶ 6.)

{¶ 6} On December 4, 2015, Williams filed a memorandum in opposition to summary judgment relying on the materials attached to defendants' motion in addition to his own deposition testimony (which was subsequently filed with the trial court on February 22, 2016). Williams' deposition testimony is consistent with the depiction of events in the video and generally as related by the officers—that it was dark but dry, that there were a number of cars stopped in the left hand lane waiting to turn left screening the curb lane from view, and that Williams was traveling in the curb lane when Petry pulled out in front of him. (Williams Dep. at 42, 45-46, 48-50.) In addition, Williams testified that Petry told him that Williams was not at fault and that Petry was likely in more trouble than Williams over the accident. *Id.* at 62. This conversation is also audible (though parts are unintelligible) on the video. (Ex. A-1 at 17:49:21-17:49:30.) Williams also testified

No. 16AP-269

that both his front air bags deployed, that his van was totaled, and that he has experienced continuing pain as a result of the accident. (Williams Dep. at 61, 68-76, 87.)

{¶ 7} On December 11, the City and Petry filed a reply. Three months later, on March 10, 2016 the trial court denied the motion for summary judgment reasoning that the City and Petry were not entitled to summary judgment based on governmental immunity because reasonable jurors could disagree about whether Petry drove wantonly.

## II. ASSIGNMENTS OF ERROR

{¶ 8} The City and Petry assert two assignments of error for review in their joint brief:

> [1.] The trial court erred when it denied the motion for summary judgment filed by the City of Columbus.

> [2.] The trial court erred when it denied the motion for summary judgment filed by Officer Brandon Petry.

Because resolution of these assignments of error ultimately turns on a question common to both, we address them together.

## III. DISCUSSION

{¶ 9} Ohio Rule of Civil Procedure 56(C) provides that:

> Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The Supreme Court of Ohio has explained:

> Summary judgment will be granted only when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the nonmoving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C); *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 327, 4 Ohio Op. 3d 466, 364 N.E.2d 267. The burden of showing that no genuine issue of material fact exists falls upon the party who files for summary judgment. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 294, 1996-Ohio-107, 662 N.E.2d 264.

No. 16AP-269

Byrd v. Smith, 110 Ohio St.3d 24, 2006-Ohio-3455, ¶ 10; see also, e.g., *Esber Beverage Co. v. Labatt United States Operating Co., L.L.C.*, 138 Ohio St.3d 71, 2013-Ohio-4544, ¶ 9.

{¶ 10} In deciding summary judgment, the trial court must give the nonmoving party "the benefit of all favorable inferences when evidence is reviewed for the existence of genuine issues of material facts." *Byrd* at ¶ 25. When reviewing a trial court's decision on summary judgment, our review is de novo and we therefore apply the same standards as the trial court. *Bonacorsi v. Wheeling & Lake Erie Ry.*, 95 Ohio St.3d 314, 2002-Ohio-2220, ¶ 24.

### A. Potential Liability of the City

{¶ 11} To determine whether a political subdivision is entitled to immunity pursuant to R.C. Chapter 2744, a court must engage in a multi-tiered analysis. *Hubbard v. Canton City School Bd. of Edn.*, 97 Ohio St.3d 451, 2002-Ohio-6718, ¶ 10, citing *Cater v. Cleveland*, 83 Ohio St.3d 24, 28 (1998). First, the court must determine whether the entity claiming immunity is a political subdivision and whether the alleged harm occurred in connection with a governmental or proprietary function. R.C. 2744.02(A)(1). In this case, there is no dispute that the City is a political subdivision as defined in R.C. 2744.01(F) or that policing is a "governmental function." R.C. 2744.02(A)(1); R.C. 2744.01(C)(2)(a). It is also undisputed the Petry was in the employ of the City and engaged in his duty as a police officer when the accident occurred. (Answer at 1.)

{¶ 12} The next tier of the analysis is to consider whether any of the exceptions to immunity enumerated in R.C. 2744.02(B)(1) through (5) apply. *Hubbard* at ¶ 12. R.C. 2744.02(B)(1)(a) provides, in relevant part, as follows:

> [A] political subdivision is liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by an act or omission of the political subdivision or of any of its employees in connection with a governmental or proprietary function, as follows:
>
> (1) Except as otherwise provided in this division, political subdivisions *are liable for injury*, death, or loss to person or property *caused by the negligent operation* of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority. The following are full *defenses* to that liability:

No. 16AP-269

> (a) A member of a municipal corporation police department or any other police agency was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did *not* constitute willful or wanton misconduct.

(Emphasis added.) Thus, by statute, there is municipal liability for injury caused by the negligent operation of a motor vehicle by a municipal employee when engaged within the scope of employment and authority. Under R.C. 2744.02(B), whether or not an aggrieved party can prove that his or her claimed injury resulted from a government employee's negligence in operating a motor vehicle within the scope of their employment and authority, if the government can show that its employee's action was not willful or wanton misconduct, recovery is barred. Williams claimed that Petry's conduct was wanton misconduct only and not "willful misconduct." The City and Petry sought through summary judgment to prove that the facts presented at that juncture of the litigation were not in dispute and that, as a matter of law, they proved that Petry's conduct was not wanton misconduct, barring Williams from recovery for his claimed personal injury.

{¶ 13} We note for the purpose of analysis that Petry was acting within the scope of his employment and authority under R.C. 2744.02(B) when he made the U-turn. His undisputed purpose was to assist his fellow officer whose vehicle was parked on the other side of the road and some distance back with an arrest for solicitation of prostitution and was by law deemed an "emergency call." R.C. 2744.01(A) concerning tort liability of political subdivisions provides that, " '[e]mergency call' means a call to duty, including, but not limited to, communications from citizens, police dispatches, and personal observations by peace officers of inherently dangerous situations that demand an immediate response on the part of a peace officer." Even though the other officer's situation did not seem to involve "an inherently dangerous situation," the legal definition of "emergency call" does not require a subjective determination of "emergency." *Smith v. McBride*, 130 Ohio St.3d 51, 2011-Ohio-4674, ¶ 21-24; *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, ¶ 10-15. That Petry was an employee of the City who was engaged in a governmental function (policing) and was on his way in a motor vehicle to assist another officer with a traffic stop is sufficient to trigger the defense proffered by the City and Petry. If the City and Petry can prove that there was no wanton misconduct, any

showing of negligence is without consequence because of the operation of Ohio's governmental immunity statute.

{¶ 14} On our de novo review, the question of the City's immunity thus resolves to a single issue, whether the summary judgment record, construed most strongly in Williams' favor, shows that Petry's driving was not wanton misconduct.

## B. Potential Liability of Petry

{¶ 15} Because Petry was also sued individually, also asserted immunity, and also was denied summary judgment on the issue of immunity, we must consider his individual immunity. *Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356 (1994). *See also Rankin v. Cuyahoga Cty. Dept. of Children & Family Servs.*, 118 Ohio St.3d 392, 2008-Ohio-2567, ¶ 37 (" '[M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor.' Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury." *Fabrey* at 356, quoting *Roszman v. Sammett*, 26 Ohio St.2d 94, 96-97 (1971).).

{¶ 16} This court has applied the *Fabrey* standard in *Yonkings v. Piwinski*, 10th Dist. No. 11AP-07, 2011-Ohio-6232, ¶ 33, when we stated:

> In the context of political subdivision immunity, wanton misconduct is "the failure to exercise any care whatsoever." *Fabrey v. McDonald* Village *Police Dept.*, 70 Ohio St. 3d 351, 356, 1994 Ohio 368, 639 N.E.2d 31, citing *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 363 N.E.2d 367, syllabus. " '[M]ere negligence is not converted into wanton misconduct unless the evidence establishes a disposition to perversity on the part of the tortfeasor.' " *Id.* at 356, quoting *Roszman v. Sammett* (1971), 26 Ohio St. 2d 94, 96-97, 269 N.E.2d 420. "Such perversity must be under such conditions that the actor must be conscious that his conduct will in all probability result in injury." *Id.*, citing *Roszman* at 97.

{¶ 17} The original analysis in *Fabrey* involved a discussion of recklessness with "wanton misconduct" that was later criticized and explained as the two not being "functionally equivalent." S*ee Glenn v. Columbus*, 10th Dist. No. 16AP-15, 2016-Ohio-7011, ¶ 8-31 (separately analyzing immunity of a fire truck driver and the immunity of the City). "The three-tiered analysis regarding the potential liability of a political subdivision 'does not apply when determining whether an employee of the political subdivision will be

No. 16AP-269

liable for harm caused to an individual.' " *Stevens v. Maxson*, 10th Dist. No. 12AP-672, 2013-Ohio-5792, ¶ 12, quoting *Mashburn v. Dutcher*, 5th Dist. No. 12 CAE 010003, 2012-Ohio-6283, ¶ 33, citing *Cramer v. Auglaize Acres*, 113 Ohio St.3d 266, 2007-Ohio-1946, ¶ 17. Instead, we consider R.C. 2744.03(A)(6)(b) which provides, in relevant part, as follows:

> **(A) In a civil action brought against * * * an employee of a political subdivision to recover damages for injury, death, or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function, the following defenses or immunities may be asserted to establish nonliability:**
>
> * * *
>
> **(6) [T]he employee is immune from liability unless one of the following applies:**
>
> * * *
>
> **(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner.**

{¶ 18} It is not disputed that Petry is (and was at all relevant times) an employee of the City, which is a political subdivision, or that the accident occurred within the scope of his employment, policing, a governmental function. *See* R.C. 2744.03(A). (Answer at 1.) Williams also does not allege that Petry acted in bad faith or with malicious purpose. *See* Compl. in passim. So whether Petry is entitled to immunity is a question of whether he drove in a wanton or reckless manner.

## C. Whether Petry's Driving Conduct was Wanton

{¶ 19} The Supreme Court of Ohio has defined "wanton" in similar cases as:

> **Wanton misconduct is the failure to exercise *any care* toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result. *Hawkins* [*v. Ivy*], 50 Ohio St.2d [114,] 117-118, 363 N.E.2d 367 [(1977)]; *see also* Black's Law Dictionary 1613-1614 (8th Ed.2004) (explaining that one acting in a wanton manner is aware of the risk of the conduct but is not trying to avoid it and is indifferent to whether harm results).**

No. 16AP-269

(Emphasis added.) *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, ¶ 33. *See also Matkovich v. Penn Cent. Transp. Co.*, 69 Ohio St.2d 210, 212 (1982). Because collisions between cars are, by nature, events in which there is great probability that harm will result if care is not taken, our analysis focuses on what it means to act without "any care" and as such for an act to be wanton. *Anderson*.

{¶ 20} Despite the broad literal meaning of the words, "any care," in *Anderson* and previously in *Matkovich,* this Court previously held that "any care" is not automatically found merely by turning on lights and siren, using brakes, or looking where one is going. We explained:

> Defendants argued and the trial court found that since the operator of the emergency vehicle had his lights and siren running that he had complied with the requirements of "any care" as stated in *Matkovich v. Penn Central. Transp. Co.* (1982), 69 Ohio St. 2d 210, 431 N.E.2d 652. Thus, the trial court found defendants could not be held to be wantonly or recklessly liable. We reject that as a simplistic analysis. Under that criteria, you could drive an emergency vehicle in any manner that you please and not be guilty of wanton or reckless misconduct simply because you activated your siren and lights. Even looking where you are going or applying one's brakes meets the literalistic, but not legal, definition of "any care." If "any care" is construed in that fashion, the exception becomes virtually meaningless.

*Hunter v. Columbus*, 139 Ohio App.3d 962, 970 (10th Dist.2000). Whether the "any care" standard is met is a fact-specific determination. *Id.* at 971 ("Each situation like this must be evaluated on its own facts."). Indeed, it is so fact-specific that both the Supreme Court and this Court have explained that "[w]anton misconduct is a jury question." *Matkovich* at 214; *see also, e.g.*, *Fabrey* at 356 (remarking that "the issue of wanton misconduct is normally a jury question"); *Hiles v. Franklin Cty. Bd. of Commrs.*, 10th Dist. No. 05AP-253, 2006-Ohio-16, ¶ 40 ("Determining whether a defendant engaged in wanton conduct is generally a question of fact for the jury."). Though this Court in *Hiles* also recognized that the matter can be appropriate for summary judgment "where the record contains insufficient evidence to support such a finding" of wantonness, we recognize that because the determination of wantonness is so fact specific, such matters are normally the province of the jury. *Id.* at ¶ 40.

No. 16AP-269

{¶ 21} The Eighth District Court of Appeals has considered a case in which it was contended that a police officer's U-turn without any warning or without taking visible precaution constituted a wanton act. *Sparks v. Cleveland*, 8th Dist. No. 81715, 2003-Ohio-1172, ¶ 20. In *Sparks*, the police officer's vehicle and the plaintiffs' vehicle were traveling in the same direction. The officer testified that "he steered to the curb lane prior to making the U-turn because his vehicle required that maneuver to execute a U-turn." *Id.* at ¶ 23. The officer testified that "his vehicle had the overhead lights on, but did not have the siren on for fear of alerting the suspect to the police's presence." *Id.* The plaintiffs presented an affidavit of a witness who had been several car lengths behind them who had pulled over to the side of the road for the police car and had witnessed the plaintiffs similarly do so ahead of the witness. After the police vehicle passed both plaintiffs' and the witness' vehicles, the witness "saw the officer suddenly slow down, shut off the lights, pull over to the side of the road, and, after several seconds, attempt to make a U-turn without any warning colliding with Sparks' vehicle." *Id.* Here, clearly, the plaintiffs' vehicle had resumed travel and passed the previously stopped police car when the collision occurred. In *Sparks*, the Eighth District found that a determination of wanton conduct was subject to determination on summary judgment and that the plaintiffs had at best shown negligence. *Id.* at ¶ 23-24.

{¶ 22} Williams' case is significantly different from *Sparks* in that Petry's U-turn was into oncoming traffic that not even he could see because of the line of cars in the center oncoming lane that were positioned in queue to turn left. When construing the evidence most strongly in favor of Williams, reasonable jurors could differ on whether Petry's actions constituted wanton conduct. Other factors not present in *Sparks* were that there was evidence that it was dark and cloudy on the night in question which reduced visibility. (Ex. A, Petry Aff. at ¶ 4; Ex. A-1.) Petry activated his lights only two seconds before beginning the U-turn maneuver and only seven seconds before impact with Williams. (Ex. A-1 at 17:41:26-17:41:33.) More compelling, there is video that visually demonstrates that at the time Petry attempted the U-turn, the lane of oncoming traffic in which Williams was traveling in the oncoming right lane was screened from Petry's view by the traffic waiting to execute left turns in the oncoming left lane. (Ex. A-1 at 17:41:30; Williams Dep. at 45-46.) The video demonstrates that Petry could not see Williams' van

and supports an evidentiary inference that Petry could not have fairly expected Williams to see his vehicle with its lights being turned on only about five or six seconds before he crossed Williams' path of travel. (Ex. A-1 at 17:41:26-17:41:32.) A reasonable juror could infer that Petry knew he could not see oncoming traffic, including Williams' van, and that a car in Williams' path of travel would not likely see him, yet he made the U-turn anyway. The video shows that Petry slowed relatively little and was still traveling 20 to 25 miles per hour when he began the maneuver and despite the lack of visibility of oncoming traffic had not stopped before he crossed Williams' lane. (Ex. A-1 at 17:41:26-17:41:33.) Moreover, at the speed he was moving, his patrol car was unable to complete much more than half of his intended U-turn within the width of four lanes. *Id.*

{¶ 23} This Court recently issued a decision on the question of when an emergency vehicle is driven in a wanton manner. *Glenn.* In the *Glenn* case, at 3:09 in the afternoon on November 12, 2013, a fire engine responding to a fire alarm at an elementary school approached an intersection with its emergency lights activated and blew its horn several times before entering the intersection against a red signal. *Id.* at ¶ 2. The record was in conflict about whether or not the siren was also activated. *Id.* at ¶ 20. But the record was not in conflict about the fact that the fire engine lights were running, that the fire engine blew several blasts on its horn, and that all cars near the intersection had stopped except Glenn's, which pulled in front of the fire engine, and was struck. *Id.* at ¶ 15-20. It was also undisputed that while the fire engine did not stop as it entered the intersection, it was driving at 35 miles per hour, which was the speed limit of the road. *Id.* at ¶ 24.

{¶ 24} *Glenn* is different from this case in a number of ways but does assist to explain why this case calls for a different outcome. In *Glenn* it was daylight whereas here it was a cloudy night. (Ex. A, Petry Aff. at ¶ 4; Ex. A-1.) *Id.* at ¶ 2. In *Glenn* the fire truck had lights running, blew its horn several times, and may also have had a siren activated, all before it entered the intersection. *Id.* at ¶ 15-20. Here, the officer did not activate a siren, did not honk the car's horn, and only activated his lights two seconds before beginning the sudden maneuver that led to the accident. (Ex. A-1 at 17:41:26-17:41:34.) In *Glenn*, the fire engine was on a predictable, visible trajectory and was unable to stop when a car suddenly ventured into its path. *Id.* at ¶ 2, 15-20. Here, the police cruiser made a sudden and unpredictable maneuver that brought it quickly into the path of a

No. 16AP-269

minivan traveling in a lane the video shows was obscured from the officer's sight, with the result that the minivan, traveling in a straight and legal path but unable to stop in time, struck the cruiser.   (Ex. A-1 at 17:41:26-17:41:34.)   We, therefore, consider this case distinguishable from *Sparks* and *Glenn*.

{¶ 25} Considering the video and other evidence in a light most favorable to Williams as we are required to do at this stage of the case, the evidence could support a factual inference by a jury that Petry's conduct was wanton.  A reasonable juror could conclude that Petry made the maneuver without knowing whether there was oncoming traffic in the far lane, without knowing whether, if there was a vehicle in that lane, it could see his cruiser or its lights (which he activated a bare few seconds before the maneuver), and without knowing whether such a vehicle could possibly stop in time to avoid the collision.  When construing the evidence most strongly in favor of Williams, a reasonable juror could conclude that Petry's driving was wanton.[3]   Both assignments of error are therefore overruled.

## IV.  CONCLUSION

{¶ 26} The trial court correctly ascertained that whether to grant summary judgment in favor of the City and Petry resolved to a single inquiry, whether Petry's driving was wanton.  Because reasonable minds could differ on that question, the City and Petry could not show, particularly "when construing the evidence most strongly in favor" of Williams, that "reasonable minds [could] only conclude that the [defendants were] entitled to judgment as a matter of law."  *Byrd* at ¶ 10.  We affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

HORTON, J., concurs.
LUPER SCHUSTER, J., concurs in part and dissents in part.

LUPER SCHUSTER, J., concurring in part and dissenting in part.

{¶ 27} I respectfully dissent from the majority's conclusion that a reasonable jury could find that Officer Petry drove his police cruiser in a "wanton" manner.  The majority concludes that a reasonable jury could find that Officer Petry acted in a wanton manner

---

[3] Because we agree that Petry's driving, when viewed in the light most favorable to Williams, could be found wanton by "reasonable minds," we do not consider whether it was reckless. *Byrd* at ¶ 10.

No. 16AP-269

because the evidence demonstrates that the officer attempted to make the U-turn maneuver without knowing (1) whether there was any oncoming vehicle in the curb lane, (2) whether the driver of such a vehicle could see his cruiser or its emergency lights, or (3) whether that driver would be able to stop his vehicle before striking the police cruiser. I disagree.

{¶ 28} I believe the majority's analysis is flawed as to whether there is sufficient evidence to send to the jury the issue of wanton misconduct. Wanton misconduct "is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, ¶ 33. As the majority correctly notes in *Hunter v. Columbus*, 139 Ohio App.3d 962 (10th Dist.2000), this court cautioned against using too "simplistic" of an analysis when considering whether an actor exercised "any care." The "simplistic" analysis rejected by this court in *Hunter* was the proposition that operating an emergency vehicle with lights and sirens running was necessarily sufficient to satisfy the "any care" requirement. *Id.* at 970. In *Hunter*, the emergency vehicle had lights and sirens running but the operator otherwise engaged in "extreme" conduct, namely, going left of center while traveling 26 m.p.h. above the road's 35 m.p.h. speed limit. *Id.* at 971. Because the probability of harm created by the operator of the emergency vehicle was much greater in those circumstances, the finding of "any care" reasonably required more than just lights and sirens. *Id.*

{¶ 29} Other than citing *Hunter's* directive not to engage in a simplistic analysis as to the wanton misconduct issue, the majority does not analyze whether Officer Petry exercised any care. Instead, the majority in effect analyzes the facts under the reckless conduct standard. To reach its conclusion as to the wanton misconduct issue, the majority reviews Officer Petry's U-turn maneuver in relation to the known risk he disregarded in making that turn. The terms wanton and reckless, however, define different degrees of care. *Anderson* at paragraph one of the syllabus and ¶ 30-31. While wanton misconduct is defined as the absence of any care, reckless conduct is defined as "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* at ¶ 34.

{¶ 30} The undisputed evidence demonstrates that Officer Petry turned on his cruiser's emergency lights before he began to make the U-turn, which was five to six seconds before he crossed Williams' path of travel. From Officer Petry's perspective at the time he began the U-turn, the only oncoming vehicles he could see were stopped. By turning on his emergency lights directly in front of the stopped oncoming vehicles, and before slowing to begin the U-turn maneuver, Officer Petry exhibited some care in trying to prevent a possible collision. He did not, however, otherwise demonstrate the type of "extreme" conduct that would "effectively negate or eliminate the significance of the care he did exhibit" for the purpose of analyzing whether his conduct was wanton. *Glenn v. Columbus*, 10th Dist. No. 16AP-15, 2016-Ohio-7011, ¶ 24.

{¶ 31} Although Officer Petry did not act wantonly, a reasonable jury could find his conduct was reckless. As the majority notes, even though Officer Petry did not, and could not, see traffic movement in the obstructed curb lane when he began the U-turn, he did not take all necessary and precautionary steps to account for the possibility that oncoming motorists in that lane would be approaching too close and too fast to safely stop before striking the officer's vehicle. Evidence concerning this disregard of a known risk presents a genuine issue of fact as to whether Officer Petry's conduct was reckless or merely negligent.

{¶ 32} Because no reasonable jury could find that Officer Petry drove his police cruiser in a wanton manner, I conclude that the trial court erred in denying the city's motion for summary judgment. Accordingly, I would sustain appellants' first assignment of error. However, because a reasonable jury could find that Officer Petry was reckless, I conclude the trial court did not err in denying the officer's motion for summary judgment. Thus, I would overrule appellants' second assignment of error but for different reasons than those expressed by the majority.

––––––––––––––––––