[Cite as *Caudill v. Columbus*, 2017-Ohio-7617.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Timothy W. Caudill, Admr. of the Estate of Julie Ann Caudill, deceased, | : | |
| | : | |
| Plaintiff-Appellant, | : | No. 17AP-129 |
| | : | (C.P.C. No. 14CV-3052) |
| v. | : | (REGULAR CALENDAR) |
| City of Columbus et al., | : | |
| Defendants-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on September 14, 2017

**On brief:** *Hollern & Associates,* and *Edwin J. Hollern*, for appellant. **Argued:** *Edwin J. Hollern.*

**On brief:** *Richard C. Pfeiffer, Jr.*, City Attorney, *Timothy J. Mangan,* and *Wendy S. Kane*, for appellees. **Argued:** *Timothy J. Mangan.*

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Plaintiff-appellant, Timothy W. Caudill, administrator of the estate of Julie Ann Caudill, deceased, appeals from a decision and entry of the Franklin County Court of Common Pleas granting the motion for summary judgment of defendant-appellee, Jeffrey Baker. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} This case involves the shooting death of Julie Ann Caudill ("Julie") on October 25, 2013 at her home at 6483 Ponset Street in Columbus. At 10:33 a.m. that day, Julie's husband, Timothy, called 911 to report that his wife had cut herself, was suicidal, and needed assistance. Timothy was out of town for work but had spoken to his wife by

phone and Julie told Timothy she was cutting herself. Because he was two and one-half hours away, Timothy asked his neighbor to go to his house to check on Julie. The neighbor confirmed to Timothy that Julie had cut herself, and the neighbor said Julie made him leave the house. Timothy specifically told the 911 operator that Julie had "talked about something about suicide by cop." (Pl.'s Ex. 1, Transcript of Audio Recording at 2, attached to Mar. 29, 2016 Mot.)

{¶ 3} Following Timothy's 911 phone call, at 10:35 a.m., dispatchers for Columbus police aired over the radio that "6483 Ponset Street, wife is cutting herself out of a '47A,' she also has a gun, this is second hand info from the husband, neighbor confirmed that she is, in fact, cutting herself." (Def.'s Ex. D, Columbus Division of Police Radio Transmissions at 10:35:11 to 10:35:16.) "47A" is the Columbus police code for a suicide attempt. Columbus police then dispatched officers from the 17th Precinct to respond to a "14," the Columbus police code for a cutting or stabbing. According to patrol Standard Operating Procedure ("SOP") 2.01, a cutting or stabbing is a Priority 1 call for service, requiring the precinct sergeant, if available, to respond as soon as practical. Appellee Jeffrey Baker, a sergeant with the Columbus Division of Police, was among the officers immediately dispatched to the scene. The radio further reported the woman "has talked about suicide by cop." (Def.'s Ex. D, Columbus Division of Police Radio Transmissions at 10:35:59.)

{¶ 4} Sergeant Baker communicated directly with the radio in which the radio stated "[i]t's a '14' out of a '47A', wife is cutting herself, she also has a gun, has talked about suicide by cop." (Def.'s Ex. D, Columbus Division of Police Radio Transmissions at 10:36:07.) At 10:36:34, Sergeant Baker reported that he was en route, but he checked the computer at the substation before he left for the "run" information. (Baker Aff. at ¶ 5; Def.'s Ex. D, Columbus Division of Police Radio Transmissions at 10:36:34.) The computer contained information that the woman's husband was the caller, that the husband was out of town, and that the woman had cut herself on the arm. Subsequent information in the computer stated the woman had access to a handgun in the house.

{¶ 5} With his lights and sirens running, Sergeant Baker drove to Julie's house in his police cruiser. During his drive, Sergeant Baker heard on the police radio that Officer Amy Muscarello had already arrived on the scene and that three other officers had been

dispatched on the run.  He also learned that medics were en route and would be "staging" near the location until police could make the location secure.  (Baker Aff. at ¶ 6.)

{¶ 6}   At 10:46 a.m., Sergeant Baker arrived at 6483 Ponset Street and parked his cruiser behind another police cruiser south of the address.  Sergeant Baker exited his cruiser dressed in standard Columbus police uniform and, as he walked toward the house, he saw that Officer Muscarello was at the southeast corner of the house and three other officers were toward the front of the house near the driveway.  All the officers were similarly dressed in the standard Columbus police uniform.

{¶ 7}   Sergeant Baker drew his weapon as he approached the house, knowing Julie had cut herself and had access to a gun.  He positioned himself to the left of the front door, just off the front porch, with cover from Officer Muscarello.  The other officers informed Sergeant Baker that no one had yet knocked on the door.  Based on the information he had at that time, including the dispatch of a cutting or stabbing and possible suicide attempt, the report of an actual injury, the presence of a cutting instrument, and the possible presence of a gun, Sergeant Baker determined, pursuant to his training, experience, and the SOP, that it was necessary to make contact with Julie.  It was Sergeant Baker's belief that Julie had cut herself and needed immediate medical attention.  Because Sergeant Baker was the patrol supervisor, it was his responsibility to make contact, assess the situation, and determine the appropriate course of action, including determining whether he needed to call for additional resources.

{¶ 8}   One of the other officers on the scene, Officer Rountree, knocked on the door first while Sergeant Baker provided cover.  After Officer Rountree received no response, Sergeant Baker waited a moment and then stepped to the front door and loudly knocked on the door twice. Sergeant Baker initially received no response but could hear a dog inside the house.  Once he stepped off the front porch, just to the left of the front door, Sergeant Baker heard a female voice say "who is it?"  (Baker Aff. at ¶ 14.)  Sergeant Baker replied it was the Columbus police, and the woman told him to go away.  Sergeant Baker then told the woman twice to open the door.

{¶ 9}   The door then opened suddenly and Sergeant Baker saw a woman, later identified as Julie, standing approximately two feet inside the doorway.  Sergeant Baker was standing approximately three feet outside the doorway to Julie's right.  Sergeant

Baker asked Julie to step outside and Julie responded "[f]uck no!" (Baker Aff. at ¶ 15.) At that moment, Sergeant Baker saw a pink and black hand gun in Julie's right hand, holding it across her body and pointing it slightly to her left. Upon seeing the gun, Sergeant Baker immediately shouted for Julie to drop the gun. Julie did not drop the gun and instead said "no," making a sudden motion on the top of the gun that Sergeant Baker believed to be the motion of racking a round into the chamber of the gun. (Baker Aff. at ¶ 15.) As she made that motion, Julie turned the gun to her right and pointed it directly at Sergeant Baker.

{¶ 10} Believing Julie was going to shoot him, Sergeant Baker fired his gun at Julie. After the first shot, Julie took one or two steps backward into the house but did not fall or drop her gun. Sergeant Baker continued firing his weapon until Julie dropped to her knees, slumped forward slightly, and dropped the gun from her hand. Sergeant Baker fired a total of eight shots in rapid succession in a span of four to five seconds. Sergeant Baker then stepped on to the porch and into the doorway, put handcuffs on Julie pursuant to SOP, and aired "shots fired" over the police radio at 10:48:41. (Baker Aff. at ¶ 18.) At 10:48:55, Sergeant Baker directed over the radio that medics be sent in from their staging area. (Baker Aff. at ¶ 18.) Medics arrived almost immediately and transported Julie from the scene to Riverside Methodist Hospital. From the time Sergeant Baker arrived on the scene until the time he aired "shots fired," only two minutes had elapsed. (Baker Aff. at ¶ 20.) Julie later died from her injuries.

{¶ 11} As police were being dispatched to Julie's house, Timothy received a call back from a Columbus police officer who asked a lot of personal questions about Julie, including asking Timothy "about what would Julie have to live for like grandchildren, children, stuff like that." (Timothy Depo. at 34.) Timothy believed this person to be a police negotiator but later learned that was not the case. The person on the phone identified himself as Dave from the Columbus Police Department, and he asked for a phone number to reach Julie. Timothy provided Julie's cell phone number.

{¶ 12} Timothy received another phone call from Dave a short time later and asked again whether Julie had a loaded hand gun, to which Timothy replied he thought she did but that he could not find it when he looked for it the night before. Timothy told Dave that

Julie had threatened suicide by cop but that he did not "think she's got that in her."  (Pl.'s Ex. 3, Transcript of Audio Recording at 2, attached to Mar. 29, 2016 Mot.)

{¶ 13} In a third phone call, Dave told Timothy "[i]t looks like we have a couple units pulling up, so we'll keep you up to date as to what's going on."  (Pl.'s Ex. 4, Transcript of Audio Recording at 2, attached to Mar. 29, 2016 Mot.)  Timothy was driving back to Columbus when he learned Julie had been shot and he needed to get to the hospital.  While he was still in the car, Timothy received a phone call from his son informing him Julie had died.

{¶ 14} On March 20, 2014, Timothy filed a complaint against the City of Columbus and Sergeant Baker, asserting claims of excessive force, deliberate indifference, recklessness, wrongful death, and respondeat superior.  The City of Columbus and Sergeant Baker filed a notice of removal on April 15, 2014, removing the action to federal court.  On July 27, 2015, the United States District Court for the Southern District of Ohio ordered the case remanded to the Franklin County Court of Common Pleas.

{¶ 15} The City of Columbus and Sergeant Baker filed a motion for summary judgment on all of Timothy's claims on March 15, 2016, asserting both the city and Sergeant Baker are entitled to immunity under R.C. Chapter 2744.  Timothy filed a memorandum contra the motion for summary judgment on March 29, 2016, asserting there remain genuine issues of material fact as to whether Sergeant Baker acted recklessly when he shot and killed Julie.  Subsequently, on April 4, 2016, Timothy filed a Civ.R. 41(A) notice of voluntary dismissal, dismissing his claims against the City of Columbus, leaving only the claims against Sergeant Baker.  Sergeant Baker filed a reply to Timothy's memorandum contra motion for summary judgment on April 5, 2016, asserting summary judgment is appropriate because there remains no genuine issue of material fact as to whether Sergeant Baker is entitled to statutory immunity.

{¶ 16} In a February 6, 2017 decision and entry, the trial court granted Sergeant Baker's motion for summary judgment, concluding reasonable minds could only conclude that Sergeant Baker's conduct did not rise to the level of recklessness and, thus, Sergeant Baker is entitled to immunity under R.C. 2744.03.  Thus, the trial court granted judgment in favor of Sergeant Baker on all of Timothy's claims.  Timothy timely appeals.

## II.  Assignment of Error

{¶ 17}  Timothy assigns the following error for our review:

> The trial court erred by granting defendant/appellee's motion for summary judgment because a genuine issue of material [f]act remains in dispute as to whether Sergeant Jeffrey Baker acted recklessly and wantonly.

## III.  Standard of Review and Applicable Law

{¶ 18}  An appellate court reviews summary judgment under a de novo standard. *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41 (9th Dist.1995); *Koos v. Cent. Ohio Cellular, Inc.*, 94 Ohio App.3d 579, 588 (8th Dist.1994).  Summary judgment is appropriate only when the moving party demonstrates (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in its favor.  Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 19}  Pursuant to Civ.R. 56(C), the moving party bears the initial burden of informing the trial court of the basis for the motion and identifying those portions of the record demonstrating the absence of a material fact.  *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996).  However, the moving party cannot discharge its initial burden under this rule with a conclusory assertion that the nonmoving party has no evidence to prove its case; the moving party must specifically point to evidence of the type listed in Civ.R. 56(C) affirmatively demonstrating that the nonmoving party has no evidence to support the nonmoving party's claims.  *Id.*; *Vahila v. Hall*, 77 Ohio St.3d 421, 429 (1997).  Once the moving party discharges its initial burden, summary judgment is appropriate if the nonmoving party does not respond, by affidavit or as otherwise provided in Civ.R. 56, with specific facts showing that a genuine issue exists for trial.  *Dresher* at 293; *Vahila* at 430; Civ.R. 56(E).

## IV.  Discussion

{¶ 20}  In his sole assignment of error, Timothy argues the trial court erred in granting Sergeant Baker's motion for summary judgment.  More specifically, Timothy

asserts there remain genuine issues of material fact as to whether Sergeant Baker is immune from liability.

{¶ 21} R.C. 2744.03(A)(6) sets forth the immunity of employees of political subdivisions and the exceptions thereto. *Stevens v. Maxson*, 10th Dist. No. 12AP-672, 2013-Ohio-5792, ¶ 12. As relevant here, R.C. 2744.03(A)(6)(b) provides immunity for a political subdivision employee who acts within the scope of his or her duties unless "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." The Supreme Court of Ohio recently explained the different degrees of care that the General Assembly requires of a political subdivision or an employee of a political subdivision in order to impose liability. In *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, the Supreme Court clarified that "[t]he terms 'willful,' 'wanton,' and 'reckless' as used in [the political subdivision liability] statutes are not interchangeable." *Id.* at ¶ 40.

{¶ 22} Willful misconduct, as defined by the Supreme Court, "implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Id.* at ¶ 32, citing *Tighe v. Diamond*, 149 Ohio St. 520, 527 (1948). Wanton misconduct "is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Id.* at ¶ 33, citing *Hawkins v. Ivy*, 50 Ohio St.2d 114, 117-18 (1977). Lastly, reckless conduct is "the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Id.* at ¶ 34, citing *Thompson v. NcNeill*, 53 Ohio St.3d 102, 104-05 (1990).

{¶ 23} Timothy does not allege that Sergeant Baker acted with malicious purpose or in bad faith. Thus, in order for Timothy's claims against Sergeant Baker to proceed, Timothy must demonstrate that Sergeant Baker's conduct was more than mere negligence. *Scott v. Kashmiry*, 10th Dist. No. 15AP-139, 2015-Ohio-3902, ¶ 26, citing *Hayes v. Columbus*, 10th Dist. No. 13AP-695, 2014-Ohio-2076, ¶ 26 (noting "[r]eckless conduct * * * is substantially greater than negligent conduct"). A showing of "[r]ecklessness requires knowledge by the actor that his 'conduct will in all probability

result in injury.' " *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, ¶ 21, quoting *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, paragraph three of the syllabus.

{¶ 24} Generally, whether an employee of a political subdivision is entitled to immunity under R.C. Chapter 2744 is a question of law. *Chavalia v. Cleveland*, 8th Dist. No. 104608, 2017-Ohio-1048, ¶ 33, citing *Conley v. Shearer*, 64 Ohio St.3d 284, 291 (1992); *see also Nease v. Medical College Hosp.*, 64 Ohio St.3d 396, 400 (1992) ("[i]mmunity of a state employee is a question of law and for such a question there is no right to a trial by jury"). We are mindful, however, that determining whether an officer's conduct rises to the level of recklessness is, by nature, a fact-specific determination and, thus, often presents a jury question. *See Williams v. Columbus*, 10th Dist. No. 16AP-269, 2016-Ohio-7969, ¶ 20. *See also Chavalia* at ¶ 33 ("whether the employee acted in a wanton or reckless manner under R.C. 2744.03(A)(6)(b) is typically a question of fact for the jury"). Nonetheless, " 'where the record contains insufficient evidence to support such a finding,' " summary judgment is appropriate. *Williams* at ¶ 20, quoting *Hiles v. Franklin Cty. Bd. of Commrs.*, 10th Dist. No. 05AP-253, 2006-Ohio-16, ¶ 40. Stated another way, summary judgment is appropriate under R.C. 2744.03(A)(6) immunity where, based on the Civ.R. 56 evidence, reasonable minds could only conclude that the employee did not act recklessly. *Scott* at ¶ 20 (the issue of whether an officer's conduct is wanton or reckless "should be submitted to a jury only when reasonable minds might differ," but where "reasonable minds could only conclude that [an officer's] conduct was, at worst, negligent," then "the issue of immunity is an appropriate issue for resolution on summary judgment"). Moreover, "the standard for proving recklessness is high, so a court may enter summary judgment in those cases where the conduct does not indicate a disposition to perversity." *Sparks v. Klempner*, 10th Dist. No. 11AP-242, 2011-Ohio-6456, ¶ 19, citing *O'Toole* at ¶ 75.

{¶ 25} Here, Timothy argues there remains a genuine issue of material fact as to whether Sergeant Baker acted recklessly when he did not call for the SWAT team or request a negotiator and instead knocked on Julie's door almost immediately after arriving on the scene. We disagree.

{¶ 26} Columbus police's SOP Directive 3.57 provides "[w]hen practical, SWAT personnel shall be advised of any situation that may require a negotiator or for which

SWAT personnel are specially trained to handle."  (Pl.'s Ex. 6 at 1, attached to Mar. 29, 2016 Mot.)  Further, Directive 3.57 states "[s]worn personnel at the scene of an incident shall decide the appropriate initial response.  Whether the decision is to provide an immediate and direct response to a violent situation, or to contain and assess the situation to achieve the best possible resolution, the use of SWAT personnel's expertise and equipment is highly encouraged."  (Pl.'s Ex. 6 at 2, attached to Mar. 29, 2016 Mot.)  Even assuming, for purposes of summary judgment, that Sergeant Baker violated Directive 3.57 when he did not request the assistance of SWAT personnel, the Supreme Court has held, "evidence of a violation of departmental policy does not create a genuine issue of material fact as to whether the violator acted with malicious purpose, in bad faith or in a wanton or reckless manner without evidence that the violator was aware that his 'conduct [would] in all probability result in injury.' " *Agrabrite* at ¶ 25, quoting *O'Toole* at paragraph three of the syllabus.

{¶ 27}  Accordingly, the question for this court is whether there remains a genuine issue of material fact as to whether Sergeant Baker acted recklessly, i.e. whether he knew his conduct would in all probability result in injury when he knocked on Julie's door and demanded Julie open it.  Construing the facts most strongly in favor of Timothy,  Sergeant Baker knew Julie was suicidal, that she may have had a gun in the house, and that she had threatened suicide by cop in the past.  Thus, Timothy argues Sergeant Baker should have known that by knocking on the door and asking Julie to come outside, there was a great probability the encounter would end in gunfire.  However, Sergeant Baker also responded to Julie's house knowing she had already cut herself and believing she needed immediate medical attention.  He averred in his affidavit that he needed to attempt to make contact with her to determine whether she was still conscious and, if so, what sort of assistance she may have needed.

{¶ 28}  Timothy argues Sergeant Baker should have talked to neighbors, asked Julie if she needed help, and asked her to drop the weapon, instead of "rush[ing] in and coerc[ing] Julie to open the door."  (Appellant's Brief at 30.)  Timothy's argument presupposes that Julie's death was the *only* possible outcome of Sergeant Baker knocking on her door.  Though there may have been some risk that Julie intended to carry out her previously expressed desire to commit suicide by cop, when Sergeant Baker knocked on

the door there remained many possible outcomes, including that Julie never responded and needed immediate medical attention, that Julie refused to answer the door, or that Julie answered the door without a weapon. Though Julie's death was clearly tragic, "[w]e must apply the law without consideration of emotional ramifications and without the benefit of 20-20 hindsight." *O'Toole* at ¶ 76. Moreover, given the many possible outcomes of Sergeant Baker's attempt to assess Julie's condition when he arrived on the scene, it cannot be said, from the Civ.R. 56 evidence, that Sergeant Baker's conduct would in all probability result in injury.

{¶ 29} Certainly, there was risk involved when Sergeant Baker responded to the scene, just as virtually every incident of police-citizen interaction carries some risk. *See Agrabrite* at ¶ 16 ("[a]n officer's role in our society creates a unique lens through which to view his or her actions and through which to determine whether those actions may have been malicious, in bad faith, wanton or reckless"); *Sparks* at ¶ 20. Importantly, however, in determining whether police conduct rises to the level of recklessness, the Supreme Court directs us to consider whether there was a conscious disregard of or indifference to a known risk that was *unreasonable* under the circumstances. *Anderson* at ¶ 34. Under these circumstances, having reviewed all the Civ.R. 56 evidence and construing it most strongly in favor of Timothy, we conclude Sergeant Baker's conduct does not rise to the level of recklessness. Sergeant Baker reasonably believed Julie was in imminent need of medical attention and, once she answered the door and pointed a gun at him, making a motion as though she were loading a round into the gun's chamber, Sergeant Baker reasonably believed Julie was about to fire a gun at him and fired his own weapon in response. Based on the Civ.R. 56 evidence provided, a reasonable juror could only conclude that Sergeant Baker acted reasonably in attempting to check on Julie's current condition and then firing his weapon when she came to the door and pointed her gun at him. *Hayes* at ¶ 31 (finding an officer's use of deadly force reasonable in the context of summary judgment where the "entire incident lasted only ten seconds," and the officer "thus had only a moment to decide whether to employ deadly force").

{¶ 30} In his memorandum contra Sergeant Baker's motion for summary judgment, Timothy argued there remained a question as to whether Sergeant Baker's conduct was reckless. On appeal, however, his assignment of error asserts there remains

a question as to whether the conduct was reckless or wanton. Though his merit brief focuses primarily on recklessness, to the extent Timothy also intended to argue wantonness, we additionally conclude a reasonable jury could only find Sergeant Baker's conduct was not wanton. As we noted above, wanton misconduct "is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson* at ¶ 33. The Civ.R. 56 evidence provided here shows Sergeant Baker responded to the scene and intended to check on Julie's well-being. We reiterate that in his affidavit, Sergeant Baker averred he needed to make contact with Julie to determine if she was still conscious and, if so, what sort of assistance she may have needed. Furthermore, Sergeant Baker directed the officers to stand to the sides of the front door instead of directly in front of it, and knocked on her door rather than barging into her residence without warning. From these undisputed facts, it cannot be said that Sergeant Baker failed to exercise any care when he responded to Julie's house. Accordingly, reasonable minds could only conclude that Sergeant Baker's conduct was not wanton misconduct. *Scott* at ¶ 20-22.

{¶ 31} Thus, because the Civ.R. 56 evidence does not create a genuine issue of material fact as to whether Sergeant Baker's conduct was anything more than negligence, Sergeant Baker is entitled to immunity as a matter of law. We agree with the trial court that Timothy's claims fail to meet the statutory exceptions to immunity. Accordingly, the trial court did not err in granting Sergeant Baker's motion for summary judgment, and we overrule Timothy's sole assignment of error.

## V. Disposition

{¶ 32} Based on the foregoing reasons, the trial court did not err in granting Sergeant Baker's motion for summary judgment on the basis of a political subdivision employee's statutory immunity. Having overruled Timothy's sole assignment of error, we affirm the decision and entry of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, J., concurs.
HORTON, J., dissents.

HORTON, J., dissenting.

{¶ 33} Although R.C. 2744.03 places an "onerous" burden on a plaintiff to demonstrate an exception to statutory immunity for law enforcement officers, Timothy has, at a minimum, demonstrated that genuine issues of material fact remain as to whether Sergeant Baker's conduct was reckless. *Argabrite v. Neer*, 149 Ohio St.3d 349, 2016-Ohio-8374, ¶ 31. For that reason, a jury should decide whether Sergeant Baker's conduct was reckless.

{¶ 34} As the majority points out, evidence of an officer's violation of departmental policy, standing alone, does not demonstrate a genuine issue of material fact as to the officer's recklessness. *Argabrite* at ¶ 21, citing *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, ¶ 37. Rather, there must be some showing that the officer was aware that his conduct would " 'in all probability result in injury.' " *Argabrite* at ¶ 25, quoting *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, paragraph three of the syllabus. In that case, there was "no evidence from which reasonable minds could conclude that [the officers] acted with knowledge that they were either violating departmental policy or that the violations would in all probability result in injury." *Argabrite* at ¶ 30.

{¶ 35} In contrast with *Argabrite*, there is ample evidence in this case from which a reasonable jury could conclude that Sergeant Baker acted with knowledge that he was violating the Columbus Police Department's policy. Sergeant Baker was well aware of the departmental policies to summon personnel from the Crisis Intervention Team ("CIT") or SWAT negotiators when responding to a call involving a suicidal person. (Baker Dep. at 18-19.) Nevertheless, he made the conscious decision to not follow either policy and instead confront Julie alone. Sergeant Baker's professed rationale for doing so was his belief, based on the dispatcher's report, that she had injured herself and "needed medical attention." (Baker Dep. at 56.) He also stated this rationale in his affidavit:

> I determined it was necessary to make contact with the woman inside to assess her situation and to address how best to resolve the matter, and to provide medical attention. This determination was based on the information I had learned over the preceding ten minutes and was consistent with my training (as an officer and a supervisor), experience and standard operating procedures. I knew there had been a cutting out of a possible suicide attempt, the report of an

> actual injury and the presence of weapons (a cutting instrument and possibly a gun). It was, therefore, my understanding and belief that the woman had cut herself and needed immediate medical attention, as well as evaluation of other issues she was experiencing.

(Baker Aff. at ¶ 11.)

{¶ 36} Sergeant Baker's deposition testimony describing the moments before the shots were fired does not support his proffered rationale. According to his testimony, he knocked on the door. Julie asked who it was and he replied, "It's the Columbus Police." (Baker Dep. at 39.) Julie responded "go away." (Baker Dep. at 40.) Using his "command voice," Sergeant Baker replied: "Open the door, ma'am." (Baker Dep. at 43.) Julie said "No. Go away." *Id.* Sergeant Baker said: "Ma'am, we're not leaving. Open the door." *Id.* She did so, and Sergeant Baker, with his gun trained on her, ordered Julie to step outside. (Baker Dep. at 45.) She responded by saying "fuck no." *Id.* It was then that Sergeant Baker noticed the gun that Julie held in her left hand. (Baker Dep. at 46.)

{¶ 37} Absent from Sergeant Baker's own account of this interaction is any attempt to inquire into Julie's condition or "assess the situation" after making contact with her, as he claims was his intention in the affidavit. He did not ask Julie if she was injured or if she was okay. He did not ask if she needed medical attention. Instead, after making contact with her, Sergeant Baker demanded that she open the door, and, with his gun trained on her, demanded that she exit the house. Between the time that Sergeant Baker first spoke to Julie and her death, he did not engage in a course of conduct that was consistent with the intentions stated in the affidavit. "It is well established that where a moving party submits conflicting affidavit statements in support of the motion for summary judgment, which are inconsistent with his prior deposition testimony, summary judgment is improper because the inconsistencies raise a credibility question that creates a genuine issue of material fact for the jury to resolve." *Concrete Coring Co. v. Gantzer*, 1st Dist. No. C-020119, 2002-Ohio-6655, ¶ 18. That inconsistency alone would create a genuine issue of material fact requiring a jury to evaluate Sergeant Baker's credibility. The need for a jury trial is underscored by the fact that these inconsistencies concern his proffered

reason for not following CPD policy of calling in SWAT negotiators or CIT personnel when dealing with a suicidal person.

{¶ 38} Furthermore, the fact that Sergeant Baker was about to face a suicidal person with a gun, yet chose to not follow CPD policy is sufficient to create a genuine issue of material fact as to whether he knew that his actions "would in all probability result in injury." *Argabrite* at ¶ 30. But overshadowing the question of recklessness is his admitted knowledge that, in addition to facing a suicidal person, Sergeant Baker knew that Julie had threatened "suicide by cop." (Baker Dep. at 57.) "To commit 'suicide by cop' is to act in a way that would require law enforcement officers to respond with lethal force." *United States v. List*, 200 Fed.Appx. 535, 544 (6th Cir.2006), fn. 2. After deciding to forgo procedure and making no attempt at dialog or de-escalation, Sergeant Baker confronted a suicidal person who was likely to act in a way that would require him to respond with lethal force with his weapon drawn. I would think that responding to any call that informs the officer that the person has mentioned "suicide by cop" would require some apparent application of training that deals with a subject with potential mental health challenges, i.e., whether conversation, negotiation, or other. Any sort of application seems absent. Officer Baker's handling of the situation appears to demonstrate that he was completely tone-deaf to the mental challenges involved in this situation. Consequently, a reasonable jury could conclude that Sergeant Baker knew that this conduct would probably result in injury, and was therefore reckless. For the foregoing reasons, I respectfully dissent.

---