[Cite as *Champagne v. Franklin Cty. Sheriff's Office*, 2019-Ohio-1459.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Mary E. Champagne, | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 17AP-721 |
| v. | : | (C.P.C. No. 16CV-9005) |
| Franklin County Sheriff's Office et al., | : | (ACCELERATED CALENDAR) |
| Defendants-Appellees. | : | |

### D E C I S I O N

### Rendered on April 18, 2019

**On brief:** *Geiser, Bowman & McLafferty LLC, J. Scott Bowman,* and *Ashley T. Merino,* for appellant. **Argued:** *J. Scott Bowman* and *Ashley T. Merino.*

**On brief:** *Ron O'Brien,* Prosecuting Attorney, and *Amy L. Hiers,* for appellees. **Argued:** *Jason S. Wagner.*

APPEAL from the Franklin County Court of Common Pleas

PER CURIAM

{¶ 1} Plaintiff-appellant, Mary E. Champagne ("Champagne"), appeals from the decision of the Franklin County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Michael Miller ("Deputy Miller"), Franklin County Sherriff [Dallas Baldwin], and the Franklin County Sheriff's Office ("FCSO"). For the reasons set forth below, we affirm the judgment of the trial court.

### I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On June 17, 2015, Deputy Miller was dispatched to a residential address in Grove City, Ohio, in order to respond to an "alarm drop," an activated burglar alarm. An alarm drop requires an immediate response. Although another deputy also responded to the dispatch, Deputy Miller stated that he would proceed to the location because he was

closer. Deputy Miller testified that he immediately began driving towards the address without activating the lights and sirens on his cruiser, in order to not alert any intruder in the home. The only information provided in the dispatch from the alarm drop was the physical address, the fact that it was a residence, and a report of motion on the first floor. (June 28, 2017 Mot. for Summ. Jgmt., Ex. B, Miller Aff. at ¶ 2-8.)

{¶ 3} Deputy Miller drove westbound on State Route 665 and slowed down as he approached the intersection with U.S. Route 62, where cars were beginning to move after the traffic light turned green. After he passed through the intersection, he looked down at the radio in his cruiser to make sure that it was tuned to the proper channel for communicating about the alarm drop. When Deputy Miller looked up, he saw that the car in front of him had stopped. He did not have time to stop the cruiser before it collided with the stopped car. The airbag deployed and several bystanders had to help him open the cruiser's door. Deputy Miller checked on the occupants of the other vehicle and then reported the accident. (Miller Aff. at ¶ 10-15.)

{¶ 4} Champagne, who was a passenger in the vehicle struck by Deputy Miller's vehicle, filed suit against defendants-appellees on September 21, 2016. She alleged that Deputy Miller had been negligent for failing to maintain an assured clear distance before the collision, resulting in injuries to her back and head. Champagne also alleged that Franklin County Sheriff [Dallas Baldwin] and the FCSO were liable under a theory of respondeat superior because Deputy Miller had acted within the scope of his employment when his negligence caused her injuries. (Sept. 21, 2016 Compl.)

{¶ 5} Defendants-appellees moved for summary judgment in the trial court on June 28, 2017. They argued that R.C. 2744.03 barred Champagne's negligence claim against Deputy Miller because he did not act outside the scope of his employment or with malicious purpose, bad faith, or in a wanton or reckless manner, as required to overcome statutory immunity. Defendants-appellees also argued that because Deputy Miller was responding to an emergency call at the time he negligently caused the accident, R.C. 2744.02(B)(1)(a) provided a full defense to Franklin County Sheriff [Dallas Baldwin] and the FCSO, the political subdivision that employed him. (June 28, 2017 Memo. in Support of Mot. for Summ. Jgmt.)

{¶ 6} In response, Champagne argued that statutory immunity did not bar her negligence claim. She provided two reasons to counter the appellees' assertion that Deputy

Miller had been on an emergency call at the time of the collision. First, she argued that in his statement to the crash investigator, Trooper Brian Satchell, Deputy Miller admitted that he had not been on an emergency call. Trooper Satchell's affidavit stated that Deputy Miller had reported that he had "not [been] operating in an emergency capacity" when responding to the alarm drop. (Sept. 1, 2017 Pl.'s Memo. Contra, Notice of Filing of Aff., Ex. 7, ¶ 9.) Second, citing an administrative regulation stating that officers "will respond" to emergency dispatches with the use of emergency lights and sirens, Champagne pointed to Deputy Miller's failure to use either. She also claimed that willful or wanton conduct is typically a question of fact for the jury, and that a reasonable jury could conclude that Deputy Miller's inattention to the road before striking her car could amount to such conduct. (Sept. 1, 2017 Pl.'s Memo. Contra at 5-10.)

{¶ 7} The trial court granted appellant's motion for summary judgment, finding that Deputy Miller's response to the alarm drop qualified as an "emergency call" under the statutory definition of the term in R.C. 2744.01(A) and the Supreme Court of Ohio's broad interpretation of that definition in *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319. The trial court also concluded that the deputy's conduct was not willful, wanton, malicious, or in bad faith, even when viewed in a light most favorable to Champagne. (Dec. 19, 2017 Decision and Entry.)

{¶ 8} Champagne filed a timely notice of appeal from the trial court's judgment. (Oct. 6, 2017 Notice of Appeal.) We note that her appeal only addresses the trial court's decision to grant appellees' motion for summary judgment under R.C. 2744.02. Appellees also moved the trial court for summary judgment in favor of Deputy Miller under R.C. 2744.03, which the trial court granted. Accordingly, Champagne has waived any argument that the trial court erred in its ruling under R.C. 2744.03.

## II. ASSIGNMENTS OF ERROR

{¶ 9} Champagne sets forth the following assignments of error:

[1.] The Trial Court erred, as a matter of law, by granting Defendants-Appellee's motion for summary judgment because genuine issues of material fact exist as to whether Deputy Miller was on an "emergency call."

[2.] The Trial Court erred, as a matter of law, by granting Defendants-Appellee's motion for summary judgment because genuine issues of material fact exist as to whether Deputy

Miller's conduct prior to the motor vehicle collision was willful and wanton.

## III. STANDARD OF REVIEW

{¶ 10} A de novo standard of review applies to a trial court's decision to grant summary judgment. *Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 548 (2001); *Byrd v. Arbors E. Subacute & Rehab. Ctr.*, 10th Dist. No. 14AP-232, 2014-Ohio-3935, ¶ 5. "When an appellate court reviews a trial court's disposition of a summary judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination." *Gabriel v. Ohio State Univ. Med. Ctr.*, 10th Dist. No. 14AP-870, 2015-Ohio-2661, ¶ 12, citing *Byrd,* citing *Maust v. Bank One Columbus, N.A.,* 83 Ohio App.3d 103, 107 (10th Dist.1992).

{¶ 11} The summary judgment standard is set forth in Civ.R. 56(C), which states that "[s]ummary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment is only appropriate if "reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor." *Id.*

{¶ 12} When moving for summary judgment, "the moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996.) After the moving party discharges its initial burden, the nonmovant must point to some evidence in the record that demonstrates the existence of a genuine issue of fact for trial. *Byrd* at ¶ 7, citing *Dresher* at 293.

## IV. ANALYSIS

{¶ 13} R.C. Chapter 2744 governs a political subdivision's immunity from tort liability. The statute "sets out the method of analysis, which can be viewed as involving three tiers, for determining a political subdivision's immunity from liability." *Greene Cty. Agricultural Soc. v. Liming,* 89 Ohio St.3d 551, 556 (2000). The analysis begins with the

premise that a political subdivision is not liable for damages arising from injury caused by an act of the political subdivision or one of its employees "in connection with a governmental or proprietary function." R.C. 2744.02(A). This "general rule of immunity is not absolute, but is limited by the provisions of R.C. 2744.02(B), which details when a political subdivision is not immune." *Liming* at 557. Thus, under the second tier of the analysis, a court must consider whether one of the five exceptions to immunity enumerated in R.C. 2744.02(B) applies. *Id.* "If any of the exceptions to immunity in R.C. 2744.02(B) do apply and no defense in that section protects the political subdivision from liability, then the third tier of the analysis requires a court to determine whether any of the defenses in R.C. 2744.03 apply, thereby providing the political subdivision a defense against liability." *Colbert* at ¶ 9.

{¶ 14} In this case, the applicable exception to the R.C. 2744.02(A) immunity is stated in R.C. 2744.02(B)(1), which provides that "political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority." Because this appeal involves a "full defense" from liability under R.C. 2744.02(B)(1) and Champagne did not appeal the trial court's ruling in favor of appellees under R.C. 2744.03, we need not address the third tier of the analysis. *Colbert* at ¶ 9.

{¶ 15} A political subdivision has full defense to liability when a police officer "was operating a motor vehicle while responding to an emergency call and the operation of the vehicle did not constitute willful or wanton misconduct." R.C. 2744.02(B)(1)(a). Whether Deputy Miller was on an "emergency call" and whether his actions amounted to "willful or wanton misconduct" are the questions raised by Champagne's first and second assignments of error, respectively.

### A. FIRST ASSIGNMENT OF ERROR

{¶ 16} In the first assignment of error, Champagne argues that it was error for the trial court to enter summary judgment in favor of appellant because there were genuine issues of material fact as to whether Deputy Miller was on an emergency call at the time of the accident. She points to an affidavit from the crash investigator, the lack of any indication of an emergency on the call sheet for the alarm drop, and Deputy Miller's decision not to

turn on the lights and sirens in the cruiser as evidence to support this argument. (Appellant's Brief at 8-12.)

{¶ 17} For purposes of a full defense to liability under R.C. 2744.02(B)(1)(a), an emergency call is defined as "a call to duty, including, but not limited to, communications from citizens, police dispatches, and personal observations by peace officers of inherently dangerous situations that demand an immediate response on the part of a peace officer." R.C. 2744.01(A). The Supreme Court of Ohio has held that the definition of "emergency call" under R.C. 2744.02(B)(1)(a) "involves a situation to which a response by a peace officer is required by the officer's professional obligation." *Colbert* at syllabus. "While generally the question of whether particular situations constitute an emergency call is a question of fact, a court may determine whether a police officer is on an emergency call as a matter of law where triable questions of fact are not present." *Smith v. McBride*, 10th Dist. No. 09AP-571, 2010-Ohio-1222, ¶ 15, citing *Hewitt v. Columbus*, 10th Dist. No. 08AP-1087, 2009-Ohio-4486, ¶ 10.

{¶ 18} As explained in *Colbert*, Deputy Miller's response to the alarm drop dispatch qualified as an emergency call under R.C. 2744.02(B)(1)(a). The police dispatch report stating that a residential alarm had been triggered was a call to duty to which Deputy Miller responded. He had a professional obligation to respond to the dispatch, and he averred in his affidavit that it required an immediate response.

{¶ 19} Trooper Satchell's statement concerning whether Deputy Miller was on an emergency call does not create an issue of fact. According to Trooper Satchell, Deputy Miller "stated that he was responding to a call for service but not operating in an emergency capacity." (Sept. 1, 2017 Pl.'s Memo. Contra, Notice of Filing of Aff., Ex. 7, ¶ 9.)[1] Deputy Miller's characterization of his actions is only a subjective assessment of the situation. The objective facts, which are not in dispute, demonstrate that his response to the dispatch about the alarm drop was a call to duty, in accordance with his professional obligation.

---

[1] Champagne has attached a notarized version of Trooper Satchell's affidavit to her appellate brief. However, under App.R. 9(A), the record on appeal consists only of those "papers and exhibits" filed in the trial court. "An exhibit merely appended to an appellate brief is not part of the record, and we may not consider it in determining the appeal." *State v. Grant*, 10th Dist. No. 12AP-650, 2013-Ohio-2981, ¶ 12, citing *In re D.P.*, 10th Dist. No. 12AP-557, 2013-Ohio-177, ¶ 18. However, because this document was filed in the trial court as well, we may consider it on appeal. (Sept. 1, 2017 Pl.'s Memo. Contra, Notice of Filing of Aff., Ex. 7, ¶ 9.)

{¶ 20} Nor does the lack of information describing an emergency on the call sheet create a genuine issue of material fact as to whether Deputy Miller was on an "emergency call" under R.C. 2744.02(B)(1)(a). As Deputy Miller stated, the only information included on the call sheet was what was reported to the police dispatcher at the time. This information not only included an activated alarm, but motion on the first floor of the residence. (Sept. 1, 2017 Pl.'s Memo. Contra, Ex. 3, Miller Dep. at 54-55.) Such a dispatch qualifies as a call to duty.

{¶ 21} Champagne points to the fact that Deputy Miller did not activate the sirens and lights on his cruiser as required by a county administrative regulation during emergency runs, and argues that the failure to activate the cruiser's sirens and lights shows that he was not on an emergency run. (Appellant's Brief at 12.) The regulation in question, Franklin County Administrative Regulation AR512, states: "Office personnel will respond to emergency-type runs, using emergency lights and sirens * * * [w]hen dispatched by the radio dispatcher." (Sept. 1, 2017 Pl.'s Memo. Contra, Ex. 1 at 2.) A violation of this regulation does not demonstrate that an officer's failure to activate sirens and lights precludes a response from qualifying as an emergency call. We have previously held that "R.C. 2744.02 simply does not require that the police officers operate their sirens or overhead lights in order to be deemed to be responding to an 'emergency call,' for purposes of invoking immunity from civil liability." *Moore v. Columbus*, 98 Ohio App.3d 701, 709 (10th Dist.1994), applying *Horton v. Dayton*, 53 Ohio App.3d 68 (2d Dist.1988).

{¶ 22} In addition, Deputy Miller's explanation for not using sirens and lights when responding to the alarm drop is consistent with being on an emergency call. As he stated during his deposition: "Responding to an alarm drop or a burglary in progress creates a potential for caustic situations. That's why we don't use lights and sirens when [we] go into those types of things." (Miller Dep. at 21.) The deputy was also concerned because on the two-way road to the address there was "not much room for anybody to pull over and get out of your way," and the goal was "get there as quickly as you can." (Miller Dep. at 22.) Regardless of whether Deputy Miller was technically in violation of the county regulation, the particular considerations surrounding the response and his stated reasons for his conduct support the conclusion that his actions constituted an "emergency call" under R.C. 2744.02(B)(1)(a).

{¶ 23} Citing *McGuire v. Lovell*, 128 Ohio App.3d 473 (3d Dist.1998), Champagne argues that summary judgment should not have been granted because whether Deputy Miller was on an emergency call was an issue of fact that required an assessment of his credibility. However, in *McGuire*, several witnesses contradicted the police officer's version of events, resulting in factual disputes over the time that he had activated the sirens and lights in his vehicle and whether he had accelerated or braked before entering an intersection. *Id.* at 483. In addition, the officer's assertion that he had "called dispatch prior to entering the chase [was] called into question" by radio logs submitted as evidence. *Id.* at 479. Here, in contrast, there is no evidence disputing Deputy Miller's version of the events or that calls into question his credibility.

{¶ 24} "There is no requirement in the statute which would limit an 'emergency call' only to those occasions where there is an inherently dangerous situation or when human life is at danger." *Moore* at 706. Deputy Miller's actions when responding to the alarm drop fully accorded with the definition of an "emergency call" under R.C. 2744.02(B)(1)(a). The trial court did not err when it reached the same conclusion. Accordingly, the first assignment of error is overruled.

### B. SECOND ASSIGNMENT OF ERROR

{¶ 25} In the second assignment of error, Champagne argues that the trial court erred in granting summary judgment because there were genuine issues of material fact about whether Deputy Miller's actions were willful or wanton. She argues that his failure to turn on the cruiser's sirens or lights, the admission during his deposition that he looked away from the road for three to four seconds, and evidence that he was driving at a high rate of speed at the time of the collision could cause a reasonable jury to conclude that Deputy Miller's actions amounted to willful and wanton misconduct. (Appellant's Brief at 13-20.)

{¶ 26} We have previously interpreted the phrase "willful or wanton misconduct" under R.C 2744.02(B)(1)(a) as indicative of "behavior demonstrating a deliberate or reckless disregard for the safety of others." *Moore* at 708. "Willful misconduct implies an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposefully doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, paragraph two of the syllabus, following

*Tighe v. Diamond*, 149 Ohio St. 520, 527 (1948). Willful conduct involves an " 'intent, purpose, or design to injure.' " *Robertson v. Dept. of Pub. Safety*, 10th Dist. No. 06AP-1064, 2007-Ohio-5080, ¶ 14, quoting *Byrd v. Kirby*, 10th Dist. No. 04AP-451, 2005-Ohio-1261, ¶ 22. "Wanton misconduct is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson* at paragraph three of the syllabus, following *Hawkins v. Ivy*, 50 Ohio St.2d 114 (1977). "A wanton act is an act done in reckless disregard of the rights of others, which reflects a reckless indifference on the consequences to the life, limb, health, reputation, or property of others." *Byrd* at ¶ 23, citing *State v. Earlenbaugh*, 18 Ohio St.3d 19 (1985).

{¶ 27} With these standards in mind, we cannot agree that Deputy Miller's actions while on the emergency call amounted to either willful or wanton misconduct. As discussed previously, his reasons for not turning on the sirens and lights in the cruiser were a precaution against alerting a potential intruder in the residence to his approach and forcing cars to pull over on a two-way road where there was "not much room for anybody to pull over and get out of [the] way." (Miller Dep. at 22.). These actions indicate a regard for the safety of others, which is the opposite of willful or wanton misconduct. *Moore* at 708.

{¶ 28} Furthermore, even if Deputy Miller violated AR512 by turning off the sirens and lights, "the violation of a statute, ordinance, or departmental policy enacted for the safety of the public is not per se willful, wanton, or reckless conduct, but may be relevant to determining the culpability of a course of conduct." *Anderson* at paragraph five of the syllabus. To demonstrate that a policy violation is evidence of more than negligence, there must be "evidence of an accompanying knowledge that the violations 'will in all probability result in injury.' " *Anderson* at ¶ 38, quoting *O'Toole v. Denihan*, 118 Ohio St.3d 374, 2008-Ohio-2574, ¶ 92. Here, not only is there no evidence that Deputy Miller had knowledge that violating AR512 would result in injury, the evidence is that Deputy Miller's actions were taken as specific precautionary measures.

{¶ 29} Champagne suggests that when the evidence is construed in her favor, it demonstrates that Deputy Miller failed to "take care" by driving through the intersection at a "high [] rate of speed" and taking his eyes off the road for three to four seconds. (Appellant's Brief at 19.) Such conduct, however, suggests mere negligence, where the defendant breaches the duty of care owed to the plaintiff, not wanton conduct. *See, e.g., Stenger v. Timmons*, 10th Dist. No. 10AP-528, 2011-Ohio-1257, ¶ 5 (stating the elements of

negligence, which require the plaintiff to prove that "(1) the defendant owed her a duty of care; (2) the defendant breached that duty of care; and (3) as a direct and proximate result of the defendant's breach, the plaintiff suffered injury"). Moreover, the evidence does not support Champagne's assertion that Deputy Miller was speeding through the intersection. The only evidence concerning his rate of speed was his recollection that he was driving 25-30 miles per hour through the intersection, where the speed limit was actually 55 miles per hour. (Miller Dep. at 22.) Coupled with his momentary glance away from the road that resulted in the collision, the evidence, at best, demonstrates negligence. This falls far short of the intent, purpose, or design to injure required to show willful conduct or the reckless disregard that demonstrates wanton conduct. *Byrd* at ¶ 22-23.

{¶ 30} Champagne argues that under *Williams*, 2016-Ohio-7969, a failure to turn on lights and sirens demonstrates wanton conduct. In *Williams*, we affirmed the trial court's ruling that reasonable minds could differ as to whether an officer's driving constituted wanton conduct. The officer made a U-turn "into oncoming traffic that not even he could see" on a four-lane urban street only two seconds after turning on his lights and siren. *Id.* at ¶ 22. Video evidence showed that the driver that the officer struck could not have seen the cruiser or its lights in the "five or six seconds" before the driver's van was struck. *Id.* Thus, we concluded that "[a] reasonable juror could infer that [the officer] knew he could not see oncoming traffic, including Williams' van, and that a car in Williams' path of travel would not likely see him, yet he made the U-turn anyway." *Id.* Here, in contrast, a reasonable juror could not conclude that Deputy Miller's three to four second distraction while going nearly half the allowable speed limit amounted to wanton conduct. Furthermore, the officer's activation of the lights and siren in *Williams* played a causal role in the injury, due to the driver's inability to see the lights. In this case, Champagne has not argued that Deputy Miller's decision to not activate them was a proximate cause of the collision, as her vehicle was stopped when Deputy Miller's cruiser struck it. In short, the facts in *Williams* are distinct from those in this case, and far more probative of the "failure to exercise any care * * * in circumstances in which there is great probability that harm will result" or recklessness that are indicative of wanton behavior. *Anderson* at paragraph three of the syllabus; *Byrd* at ¶ 23.

{¶ 31} For the foregoing reasons, we conclude that the trial court did not err when it ruled that the undisputed evidence showed that Deputy Miller's actions during the

emergency call did not amount to willful or wanton misconduct. Accordingly, the second assignment of error is overruled.

## V. CONCLUSION

{¶ 32} The trial court did not err when granting summary judgment in favor of the appellees and granted them immunity from liability under R.C. Chapter 2744. Accordingly, the first and second assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

SADLER, DORRIAN and BRUNNER, JJ., concur.

————————————